[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bates,* Slip Opinion No. 2020-Ohio-634.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-634

THE STATE OF OHIO, APPELLEE, *v*. BATES, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Bates,* Slip Opinion No. 2020-Ohio-634.]

*Criminal Law—Aggravated murder—Ineffective assistance of trial counsel—Empanelment of biased juror—Convictions and death sentence reversed and cause remanded.*

(No. 2016-1783—Submitted February 19, 2019—Decided February 27, 2020.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B1501811.

_____

DONNELLY, J.

{¶ 1} Appellant, Glen E. Bates, appeals as of right from his aggravated-murder and other felony convictions and the death sentence imposed by the Hamilton County Court of Common Pleas. He has presented 17 propositions of law for our consideration, but the dispositive issue presented is whether he was deprived of his constitutional right to the effective assistance of counsel when defense counsel, during voir dire, failed to question or strike a racially biased juror.

{¶ 2} We hold that defense counsel's performance during voir dire was objectively unreasonable and that counsel's deficient performance prejudiced Bates by allowing the empaneling of a biased juror in violation of Bates's Sixth Amendment right to effective assistance of counsel. We therefore reverse Bates's convictions and sentence and remand this case to the trial court for a new trial.

## I. FACTUAL BACKGROUND

{¶ 3} Glenara Bates was born to Andrea Bradley and Glen Bates in January 2013 and immediately placed in foster care in the same home where her four older half siblings were already staying. In September 2013, a court ordered that the five children be returned to Bradley. According to Glenara's foster mother, Glenara weighed almost 20 pounds at that time.

{¶ 4} In December 2014, Bradley took Glenara to Cincinnati Children's Hospital ("CCH"), where Glenara was admitted for poor weight gain, possible malnutrition, and failure to meet developmental milestones. At this time, Glenara was about 23 months old and weighed 17 pounds, 7 ounces.

{¶ 5} Dr. Brian Herbst, a CCH physician, testified that when she was admitted, Glenara could "stand supported but was unable to walk." After ruling out other conditions, Dr. Herbst diagnosed Glenara with malnourishment caused by "not taking in enough calories." He found no other signs of physical abuse. Glenara gained weight as she was fed at the hospital, and Bradley was counseled about the importance of proper nutrition. Glenara was released into Bradley's care approximately ten days after she had been admitted to CCH.

{¶ 6} On March 29, 2015, Bradley arrived at the CCH emergency department holding Glenara, who was unresponsive. The physician who examined her, Dr. Richard Strait, testified that Glenara "had no signs of life," was cold and pale, had "multiple old scars," had "breakdown of the skin in multiple areas," "was totally emaciated," and "looked very small for what was her stated age." Despite

many efforts to revive her, Glenara was pronounced dead at 1:01 p.m. At the time of her death, Glenara weighed less than 14 pounds.

{¶ 7} Dr. Strait observed that Glenara had a scar on her forehead; broken and missing teeth and associated trauma to her gums; bruises from head to toe; loop-shaped scarring on her legs; ulcerated lesions on her fingers, buttocks, and back; and bite marks on her body. Based on Glenara's condition, Dr. Strait suspected severe abuse.

{¶ 8} Glenara's half sister, ten-year-old J.F., testified at trial. She explained that after the children were reunited with Bradley, life "was pretty good" for Glenara for a few months until Bradley and Bates "did a few things" to Glenara because they did not like her. She explained that they made Glenara sleep on the bathroom floor and did not feed her well and that Bradley sometimes beat Glenara with a belt. She also said that she saw Bates bite Glenara and that Bates seemed angry whenever he did that.

{¶ 9} J.F. testified that on March 28, 2015, the day before Glenara died, she saw Bates "bang [Glenara's] head against the wall" in the downstairs hallway of the house where they were living at the time. She said that something had happened to make Bates angry and that he held Glenara by the legs and "swung her" against the wall. According to J.F., Glenara cried at first and then suddenly became silent.

{¶ 10} Hamilton County Deputy Coroner Dr. Jennifer Schott, who performed Glenara's autopsy, determined to a reasonable degree of medical certainty that Glenara's death was caused by "Battered Child Syndrome with acute and chronic intracranial hemorrhages and starvation." She detailed Glenara's extensive injuries for the jury through testimony and photographic evidence. She identified a number of conditions that had been caused by a combination of "chronic stress" from malnutrition that reduced Glenara's chances of fighting off infections, poor hygiene, and general starvation.

**{¶ 11}** Dr. Schott testified extensively about subdural and subarachnoid hemorrhages caused by blunt-force trauma, which were fatal injuries to Glenara's head. She explained that injuries of this type are usually the result of "nonaccidental trauma" and are "markers of the underlying injury of the brain itself," which leads to death. Dr. Schott opined that the subdural and subarachnoid hemorrhages were more consistent with Glenara being held by her legs and swung against a wall or doorframe, as opposed to being dropped and landing on her head. She explained that it is rare for a short linear fall to result in a subdural hemorrhage. Instead, the type of injuries Glenara had are usually caused by "rotational acceleration" that occurs when a child is shaken or swung against an object.

**{¶ 12}** The autopsy also revealed a combination of lacerations, abrasions, and contusions to Glenara's head, with Dr. Schott identifying for the jury visible contusions at various stages of healing "all the way around the head," including "areas that are not typically contused in two-year-olds." According to Dr. Schott, the bruising and abrasions indicated that Glenara had received many blows to the head, though she could not state with certainty how many. She told the jury that "the sheer number of injuries in multiple different planes around the head is very suspicious for child abuse." Dr. Schott also identified "numerous, countless, [and] overlapping" scars all over Glenara's body as well as scar patterns consistent with bite marks and blunt-force trauma caused by impacts from a "very, very thin" item, such as a belt. The autopsy indicated that Glenara had previously suffered a fractured rib bone that was starting to heal; Dr. Schott stated that the location of the fractured bone made it "highly suspicious for child abuse."

**{¶ 13}** Shortly after Glenara was pronounced dead, CCH notified Cincinnati police that there was evidence that Glenara had been abused. Detective Bill Hilbert viewed Glenara's body at the hospital that day and testified that because of her emaciated condition, his "first impression was [that he] was looking at a six-

4

month-old baby." Police brought Bradley and Bates to the police station to be questioned separately and interviewed Bradley regarding Glenara's injuries.

{¶ 14} That evening, Detective Hilbert and Detective Eric Karaguleff conducted the first of three interviews with Bates after he voluntarily waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Bates acknowledged that he had been staying with Bradley and the children for the previous week or two, including on March 28. He said that on March 29, he woke up around noon and that while he was still in bed, Bradley told him that Glenara would not wake up. He then told Bradley to take Glenara to the hospital.

{¶ 15} When asked about Glenara's specific injuries, Bates quickly admitted to noticing bruises on her legs and said that he had seen Bradley "whoop" Glenara with a belt before but never with the buckle end. He denied having been home when Glenara was cut on her forehead, and he denied noticing the bruise covering the left side of her head. He told the detectives that Glenara had burned her thumb when she grabbed some hot ravioli and that the swelling and cuts on her feet happened when she smashed her feet into a door "or something." At one point, Bates said that he "ain't laid no fingers on her" and that Bradley caused all the injuries.

{¶ 16} Bates initially denied causing (or even noticing) bite marks on Glenara's torso and limbs, but after one of the detectives told him that dental impressions would indicate who bit her, he admitted that he had bitten Glenara two or three times. Bates said that he sometimes would play "doggy gonna get you," which he said involved grabbing Glenara with his teeth "like a dog" and then shaking her. He told the officers that he probably bit her too hard but that he was just playing and never intentionally meant to bite her hard enough to leave a mark.

**{¶ 17}** Bates eventually acknowledged the significant bruising on the left side of Glenara's head, but he still denied causing the injury or seeing Bradley do anything that would have caused it.

**{¶ 18}** Less than one hour after the first interview ended, the detectives conducted a second interview. They asked Bates whether it was possible that Glenara had fallen while he was holding her up by her feet or while she was hanging from a ledge or a doorframe. Bates denied that either scenario had occurred, saying that "[t]he only thing I can think is * * * when she was sitting in the chair, like when I set her in the chair she fell." And he said that Glenara was "[j]ust normal" after she had fallen off the chair and hit her head. Later during the second interview, Bates changed course and admitted to holding Glenara "up by her feet and swing[ing] her and stuff," but he continued to deny that she had been hurt when he did that. He also continued to deny having any knowledge of how Glenara had injured the left side of her head and insisted that he would have remembered if he had dropped her.

**{¶ 19}** Detective Marcus McNeil conducted Bates's third interview. Bates initially repeated what he had told Detectives Hilbert and Karaguleff, again denying that he had dropped Glenara on her head. But halfway through the interview, he changed course again and told Detective McNeil that as Bradley had said during her police interview, he "was holding her up and she fell," landing on her head. He explained that he "was holding her by her legs, up in the air like this, just playing with her, wee, and she, actually she had on shoes and she just came right out of the shoes." According to Bates, this incident happened about a week earlier and Glenara was fine afterward and was "drinking, eating, playing. Doing what she always do, really just sitting there looking at everybody." Bates also acknowledged that on March 28, Glenara had been acting tired and sleepy all day, but he still denied that she had been injured that day.

6

## II.  PROCEDURAL HISTORY AND SENTENCING

{¶ 20} A grand jury indicted Bates on one count of aggravated murder of a child under the age of 13 (R.C. 2903.01(C)), one count of child endangering (R.C. 2919.22(B)(1)), and one count of noncapital felony murder (R.C. 2903.02(B)) based on child endangering.  The aggravated-murder count included one specification under R.C. 2929.04(A)(9), which alleged that in committing the murder of a child under the age of 13, Bates either was the principal offender or committed the aggravated murder with prior calculation and design.

{¶ 21} Bates pleaded not guilty to all counts and the capital specification, and the case was tried to a jury.  The jury returned guilty verdicts on all counts and the specification.

{¶ 22} After a mitigation hearing, the jury unanimously recommended a sentence of death, and the court accepted the recommendation and imposed the death sentence.  The court also sentenced Bates to eight years of imprisonment for his child-endangering conviction and to a prison term of 15 years to life for the felony-murder conviction.  The court ordered Bates to serve the noncapital sentences consecutively to each other but concurrently with the death sentence.

## III.  ANALYSIS

{¶ 23} In his 17th proposition of law, Bates contends that he was denied his constitutional right to effective assistance of counsel when defense counsel failed to question and strike a juror who made racially biased statements on her juror questionnaire and that counsel's constitutionally deficient performance denied him a fair and impartial jury.[1]

---

1. In his 15th proposition of law, Bates contends that he was denied his constitutional right to an impartial jury under the Sixth and Fourteenth Amendments, in part because certain seated jurors expressed potential racial bias during voir dire.  Because we reverse and remand based on Bates's ineffective-assistance-of counsel claim with respect to one of those jurors, it is unnecessary for us to reach a second constitutional challenge regarding juror bias.

## A. Applicable legal standards

{¶ 24} To prevail on his ineffective-assistance claims, Bates must demonstrate both that "counsel's representation fell below an objective standard of reasonableness" and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, Bates must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Id.* at 687. And to establish prejudice, he must show "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.*

{¶ 25} To satisfy *Strickland*'s first prong, Bates must demonstrate that defense counsel's performance was objectively unreasonable in light of counsel's failure to question or strike the jurors at issue. *Hughes v. United States*, 258 F.3d 453, 461 (6th Cir.2001). To show prejudice under *Strickland* in this instance, Bates " '*must* show that [a] juror was *actually biased* against him.' " (Emphasis added in *Mundt*.) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001). "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), citing *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). In sum, Bates must prove that at least one of the jurors at his trial, because of the juror's partiality or biases, was not "capable and willing to decide the case solely on the evidence" before that juror. *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 26} Actual bias can be found from a juror's express admission or from circumstantial evidence of the juror's biased attitudes. *Hughes* at 459. For example, courts have found actual bias when a juror unequivocally stated that she could not be fair due to law-enforcement bias, *id*. at 459-460, when a juror had a

8

fixed opinion of the defendant's guilt based on pretrial publicity, *Irvin v. Dowd*, 366 U.S. 717, 727-728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), or when a juror expressed views on the death penalty that "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,' " *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

## B. Juror No. 31

### 1. Relevant facts

{¶ 27} One of the questions on the written juror questionnaire asked, "Is there any racial or ethnic group that you do not feel comfortable being around?" Juror No. 31, a Caucasian woman, answered "yes" and in the space allotted for explanation wrote: "Sometimes black people." Another question started with the statement, "Some races and/or ethnic groups tend to be more violent than others," then asked jurors to choose among the options of "strongly agree," "agree," "strongly disagree," "disagree," and "no opinion." Juror No. 31 indicated that she strongly agreed and then wrote "Blacks" in the space allotted for explanation.

{¶ 28} During voir dire, the trial court gave counsel for the state and for Bates the opportunity to question groups of 12 prospective jurors at a time. Defense counsel asked one of the groups of 12 the following questions:

> Now, one question or one area of inquiry that we find necessary sometimes to ask is about an individual's race. * * * [I]t's important * * * for a defendant's rights, to ensure that he gets a fair trial, but, really, also that the State of Ohio gets a fair trial. Okay?
>
> Mr. Bates is an African American gentleman. * * * Does anybody believe that Mr. Bates' race—in other words, that he is an African American—should play any role in this trial whatsoever?

\* \* \*

Everyone is shaking their head. And that's good.

Anybody at all? Again, there is no wrong answer. Everyone has personal biases, beliefs. Okay? It's natural. If that plays a role in any way, shape or form please let us know. If there is any issue or problem, raise your hand. Please let us know. That is critically important.

**{¶ 29}** But juror No. 31 was not part of that group of 12 prospective jurors and in fact was not even in the courtroom when defense counsel asked the foregoing questions.[2] In fact, juror No. 31 was never questioned about Bates's race even considering her responses on the juror questionnaire. Defense counsel did not challenge any jurors for cause. Despite having an available peremptory challenge, defense counsel failed to strike juror No. 31 and allowed her to be empaneled.

*2. Discussion*

**{¶ 30}** "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.' " *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), quoting *Smith*, 455 U.S. at 217, 102 S.Ct. 940, 71 L.Ed.2d 78. "Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice or predisposition about the defendant's culpability." (Citations omitted.) *Gomez v. United States*, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions

---

2. The trial transcript clearly reveals that juror No. 31 had been removed to another room in the courthouse after counsel questioned her group of 12.

10

and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

{¶ 31} The adequacy of voir dire thus directly affects the ability of the trial judge to be a diligent gatekeeper to protect the defendant's constitutional rights. Despite the wide latitude we typically afford defense counsel in determining how to best conduct voir dire, *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 218, we have held that counsel performs deficiently under *Strickland* when they fail to question a juror about racially biased comments made on a questionnaire, *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 212. As in this case, the juror questionnaire in *Pickens* asked, "Is there any racial or ethnic group that you do not feel comfortable being around?" The *Pickens* juror answered "yes" and wrote: "Young black men with their pants down to their knees." *Id.* at ¶ 209. The same juror answered "yes" to the question, "Have you ever had a negative or frightening experience with a person of another race?" The juror wrote: "At a gas station—black man appeared—'Give me your wallet or die right here.' " *Id.* Although the prosecutor in *Pickens* questioned the juror about the robbery he had mentioned, no one asked the juror about his other comments, including his comment about young black men. *Id.* at ¶ 210. Because "[t]here appear[ed] to be no discernable reason * * * why counsel would not question [the juror] about his racially biased comments," we concluded that counsel were deficient. *Id.* at ¶ 212.

{¶ 32} Here, too, "[t]here appears to be no discernable reason" why defense counsel would not question juror No. 31 about her comments to determine whether she could be impartial or attempt to strike juror No. 31 for cause or by using one of the available peremptory challenges. *Id.* Defense counsel did ask a general question to juror No. 31's group of 12 regarding whether anyone was unable to be "fair and impartial," but no one responded to that very general question and it was

insufficient under the circumstances. We hold, therefore, that counsel's voir dire of juror No. 31 was objectively unreasonable under *Strickland*.

{¶ 33} "To maintain a claim that a biased juror prejudiced him, * * * [a defendant] must show that the juror was actually biased against him." *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir.1995), citing *Smith*, 455 U.S. at 215, 102 S.Ct. 940, 71 L.Ed.2d 78. Actual bias can be revealed through a prospective juror's express admission, but "more frequently, jurors are reluctant to admit actual bias" and it must be exposed through circumstantial evidence. *Miller v. Webb*, 385 F.3d 666, 673 (6th Cir.2004).

{¶ 34} Although we concluded that counsel had performed deficiently in *Pickens*, we determined that there was no evidence that the juror was actually biased against Pickens himself. 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 213. We stated that the juror's "comment about '[y]oung black men with their pants down to their knees' [did] not necessarily reflect bias against Pickens personally." *Id.* We also stated that "[w]hether failure to strike [the juror] from the panel was prejudicial [was] speculative because it [was] possible that he might have been rehabilitated under further questioning." *Id.*

{¶ 35} Today, we overrule *Pickens* to the extent that it held that actual *racial* bias must be shown by demonstrating bias against a defendant *personally*. Connecting a juror's potential bias with the defendant personally may make sense for cases involving a juror's personal connection with the case, such as the juror issues present in the cases cited in *Pickens*. *See Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 49-70 (challenging a juror who had prior knowledge of the case from her sister and expressed sensitivity to crimes involving the abuse and rape of children), and *Miller v. Francis*, 269 F.3d at 611-613, 616-620 (challenging a juror who had prior knowledge of the case and was employed as a county caseworker for the victim's mother). But actual racial bias may be present without a demonstration of bias against the defendant *personally* if the

juror's statement rises to a level of generality about a racial or ethnic group that indicates the juror's inability to be impartial in the particular case before him or her.

{¶ 36} The dissenting opinion accuses the majority of holding that potential juror bias is sufficient to constitute a constitutional violation. That accusation is without basis. To be sure, the law requires actual bias in order to presume prejudice under *Strickland*. And if a juror provides some indications of impartiality notwithstanding statements that suggest bias, then whether that juror is *actually* biased and the defendant prejudiced may be a closer question. *See Miller v. Webb*, 385 F.3d at 674-675; *Hughes*, 258 F.3d at 460; *Mundt* at ¶ 71-76. But that is not the case before us. Here, we have a juror's admission of bias with no reassurance of impartiality. Speculation that defense counsel, the prosecution, or the trial judge *could have sought* such reassurance of impartiality from a juror who admitted bias cannot nullify the prejudicial impact of that juror's participation in the trial.

{¶ 37} Here, juror No. 31 expressed her view, under oath on the questionnaire, that "Blacks" as a group are more violent than other races or ethnic groups. She also stated that she "[s]ometimes" does not feel comfortable being around "black people." And juror No. 31's silence in response to a general group question about fairness is not sufficient to provide an assurance of impartiality. *See Hughes* at 461. Counsel's failure to ask a single individual question of juror No. 31 to establish that she could be impartial and counsel's failure to attempt to strike that juror permitted a juror who expressly admitted her racially biased view that black people—including Bates—are inherently more violent than other people to sit on the jury that determined his fate. Under these facts, we hold that juror No. 31's statements demonstrate her actual bias against Bates. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Racial bias "casts doubt on the integrity of the judicial process" and

"impairs the confidence of the public in the administration of justice." *Id*. at 556. The presence of racial bias in a capital case is particularly troubling.

{¶ 38} In a capital-case sentencing hearing, the jury is called upon to make "a 'highly subjective, "unique, individualized judgment" ' " regarding the punishment that the defendant receives. *Turner v. Murray*, 476 U.S. 28, 33-34, 106 S.Ct. 1683, 90 L.Ed.2d (1986) (plurality opinion), quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), fn. 7, quoting *Zant v. Stephens*, 462 U.S. 862, 900, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in judgment). Because of the discretion entrusted to the jury in a sentencing hearing in a capital case, "there is a unique opportunity for racial prejudice to operate but remain undetected." *Id*. at 35. That is precisely what happened here. Unearthing racial prejudice when it persists in a capital trial is especially important because jury unanimity is required to impose the death sentence, R.C. 2929.03(D)(2), and a single juror's bias can make the difference between life and death.

{¶ 39} Because a defendant may demonstrate actual racial bias by showing that a juror has expressed a bias against a racial group to which the defendant belongs that indicates that the juror is unable to be impartial in the particular case before him or her, we hold that Bates has demonstrated that defense counsel's failure to question or strike juror No. 31 and decision to waive the defense's last peremptory challenge resulted in the empanelment of an actually biased juror. The prejudice to Bates is apparent—as a result of counsel's objectively unreasonable performance during voir dire of juror No. 31, an actually biased juror sat on the jury and, therefore, Bates was denied his constitutional right to be tried before an impartial jury. The threat that a "powerful racial stereotype—that of black men as 'violence prone,' " *Buck v. Davis*, __ U.S. __, 137 S.Ct. 759, 776, 197 L.Ed.2d 1 (2017), quoting *Turner* at 35—infected the jury's deliberations as a result of juror

No. 31's bias is unacceptable.[3]    We therefore hold that defense counsel's representation was constitutionally ineffective as to juror No. 31.

### IV.  CONCLUSION

**{¶ 40}** Because the empanelment of juror No. 31 denied Bates an impartial jury, we sustain Bates's 17th proposition of law as to that juror.  After thoroughly reviewing the record, we are compelled to conclude that Bates was deprived of his right to effective counsel when defense counsel failed to inquire into the expressed bias of juror No. 31 on voir dire or strike the juror and, therefore, his convictions and death sentence cannot stand.  In light of this conclusion, we need not reach Bates's remaining propositions of law.

**{¶ 41}** We reverse the judgments of conviction and sentence of death entered against Glen E. Bates and remand this case to the Hamilton County Court of Common Pleas for a new trial.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and FRENCH and STEWART, JJ., concur.

FRENCH, J., concurs, with an opinion joined by STEWART, J.

FISCHER, J., concurs in judgment only, with an opinion.

STEWART, J., concurs, with an opinion.

DEWINE, J., dissents, with an opinion joined by KENNEDY, J.

––––––––––––––––––

3. The dissenting opinion states that "[t]here is nothing in the record from which to conclude that juror No. 31 * * * was unable to render a fair and impartial verdict in this case."  Dissenting opinion at ¶ 91.  To the contrary, juror No. 31 stated that she believes black people are more violent than other races or ethnic groups.  That is an express admission of racial bias that reveals a predisposition about a black person's propensity for violence.  Ignoring the weight of this statement defies explanation.

**FRENCH, J., concurring.**

{¶ 42} I agree with the majority that the defense counsel's performance during voir dire was objectively unreasonable and that counsel's deficient performance caused the empaneling of a biased juror in violation of Glen Bates's Sixth Amendment right to effective assistance of counsel. I also agree that no further prejudice analysis under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is required because, in my view, a juror's actual bias deprived Bates of his constitutional right to be tried before an impartial jury. *See Hughes v. United States*, 258 F.3d 453, 463 (6th Cir.2001) (the presence of a biased juror cannot be harmless; prejudice under *Strickland* is presumed). I, therefore, join the majority opinion's analysis and disposition.

{¶ 43} I write separately, however, to address the dissent's unnecessary recounting of the torture the young victim suffered before she died. A person of ordinary conscience can hardly believe that such cruelty exists. It causes anger and passion and, if allowed, a rush to judge the person accused of committing such heinous acts. Our job, in the face of those facts, is to ensure that all constitutional guarantees were met. It is easy to grant those protections to an accused who appears to be innocent. It is also easy to grant those protections when the facts at issue are unemotional and do not cause our passions to rise. But here, facing the possibility that a prospective juror may respond to accusations of such cruelty by prejudging a defendant because of his race, we—and defense counsel, the prosecution, and the trial court—must be extra vigilant. The dissent does a disservice to principles of equal justice to the extent it suggests otherwise.

STEWART, J., concurs in the foregoing opinion.

———————————

**FISCHER, J., concurring in judgment only.**

{¶ 44} I respectfully concur in judgment only.

16

{¶ 45} In reaching its conclusion to reverse the convictions and death sentence of appellant, Glen E. Bates, the majority opinion's analysis reexamines *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, and overrules a portion of that decision. While I understand the concerns underlying the majority's analysis, I conclude that based on the particular facts present in this case—which differ from the facts in *Pickens* in a highly and saliently important way—it should be resolved without overruling the holding in *Pickens*.

{¶ 46} In *Pickens*, the juror at issue had answered questions on the written juror questionnaire in a manner that indicated that he may have been biased against African Americans. *Id.* at ¶ 209. To that extent, the relevant juror in *Pickens* and juror No. 31 in this case are similar. In addition, in both cases, neither the defendant's counsel nor the trial court asked any questions about the answers the juror had given on the questionnaire, *see id.* at ¶ 212.

{¶ 47} Nevertheless, *Pickens* is distinguishable for several specific reasons. In *Pickens*, the juror had answered a different question on the juror questionnaire by stating that he believed that "racial discrimination against African-Americans in our society" is a "very serious problem." *Id.* at ¶ 209. The juror in this case made no comparable statement. Moreover, the state in *Pickens* questioned the juror about one of the juror's answers that indicated his possible racial bias. *Id.* at ¶ 210. The state did not do so in the case at bar.

{¶ 48} We give great latitude to defense counsel to try their case, especially in the area of juror selection. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 218; *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 206. And we should. In *Pickens*, the defendant's trial counsel listened to the state's questioning of the juror who was potentially biased. Pickens's counsel could have reached a conclusion that based on the juror's answers to the state's questions and based on the juror's concession that racial discrimination is a "very serious" societal problem, the defense would "stick" with that juror and allow

him to be seated on the jury. Thus, in *Pickens*, defense counsel reasonably could have decided not to use a peremptory challenge regarding that juror, despite having peremptory challenges remaining. Notably, there were indications in that case's record that that juror may not have been actually biased against the defendant, causing this court to hold that the defendant had failed to show prejudice under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 49} In the case at hand—most importantly and unlike *Pickens*—the only questioning of juror No. 31 that is even remotely relevant to this issue consisted of a generic question to her group of jurors about their ability to be fair and impartial. Such generic questioning is unhelpful in obtaining information about a juror's possible bias. *See Morgan v. Illinois*, 504 U.S. 719, 734-735, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (rejecting the argument that general inquiries of this type may be used to detect jurors who have views that prevent or substantially impair them from carrying out their duties). Neither the state nor defense counsel nor the trial court specifically questioned juror No. 31 about her answers to the questions on the questionnaire that indicated her possible (or likely) racial bias. And then, despite the fact that the only evidence in the record shows this racial bias by this juror (which was antithetical to Bates as a member of the group the juror was biased against), defense counsel failed to either challenge juror No. 31 for cause or use a peremptory challenge, even though one was available.

{¶ 50} This case thus has a distinct fact pattern that was not present in *Pickens*. In this case, no one questioned the juror or sought more information about the racially biased statements, leaving the record in this case showing only (1) statements indicating that the juror was biased against the defendant's race and (2) defense counsel's failure to challenge juror No. 31 by not using an available peremptory challenge or making any challenge for cause. The combining of these two material facts on this record separate this case from our decision in *Pickens*.

The unique situation and fact combination of the only evidence in this record revealing racial bias against a defendant who is of that race or color, specifically coupled with no effort by trial counsel to challenge that juror in any way and the lack of any specific questioning by the state or the trial court, leaves this court with a record that demonstrates that defense counsel provided ineffective assistance in this matter.

{¶ 51} In the end, when a juror makes statements that show a distinct bias against the race or color of the defendant and there is no specific questioning of that juror by anyone in the courtroom, a reviewing court has before it a record in which the only evidence and reasonable inference that can be drawn in the case is that the juror was actually biased against that specific person, the defendant. Under such facts, if the defendant's trial counsel then permits that juror to be seated on the jury without using an available peremptory challenge or attempting a challenge for cause, it is ineffective assistance of counsel.

{¶ 52} Some may argue that this creates a problem of possible "sandbagging" by defense counsel. What I mean by "sandbagging" is the potential for a defendant's trial counsel to purposely not question a juror who has made a racially biased statement—which was directed to the race of the defendant in the case—and have a point to appeal in the record of the case (which might ultimately cause an appellate court to reverse the defendant's eventual conviction) before the defendant's actual trial even begins.

{¶ 53} Such an argument is, in reality, a strawman or a red herring. For as seen in *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 210, and in other cases, *see, e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 232-234, the state or the trial court may, even if defense counsel does not, question a juror who has indicated that the juror may be biased against that defendant's race. Assuming arguendo that the state has done so and that the state's questioning has potentially "rehabilitated" that juror, defense

counsel may then decide whether to refrain from asking any questions of that juror, as happened in *Pickens*, or defense counsel may ask questions in an attempt to refute or clarify the rehabilitation. (Moreover, defense counsel may always initiate the questioning of such a juror on defense counsel's own initiative.) Thus, the fear of so-called sandbagging is not a true problem in reality.

{¶ 54} For these reasons, based on the unique facts involved and the situation that occurred in this case, I respectfully concur only in the court's judgment.

———————————

**STEWART, J., concurring.**

{¶ 55} I join the majority opinion but write separately because, in addition to holding that appellant, Glen Bates, was denied his constitutional right to effective assistance of counsel when defense counsel failed to question and strike the juror who made racially biased statements on her juror questionnaire, I would hold that Bates was denied his constitutional right to effective assistance of counsel when defense counsel failed to question and strike juror No. 10 who, because she was a mother of three daughters and a grandmother of an infant, expressed doubts about whether she could be impartial.

{¶ 56} During general voir dire, one of the prosecutors informed the prospective jurors that they would be required to consider trial evidence that was "not pleasant," such as the coroner's testimony and autopsy photographs. He then asked, "Does that cause anybody any problems that would make them say I can't do this, I can't serve?"

{¶ 57} In response, the following colloquy occurred:

> [Juror No. 10]: I'm not sure if I can at this point.
> [Prosecutor]: Okay. Juror Number 10; is that right?
> [Juror No. 10]: (Nodding head.)

[Prosecutor]: You know what, again, this is not going to be pleasant. And I'm not suggesting that it should be. I need you to kind of dig deep inside yourself. You know, this service that we're asking you to perform, this jury duty is difficult. And sometimes the unpleasantness is kind of just part of—it's unavoidable. It's part of [what] you as jurors have to see and hear. It's not what you see in your normal lives or in your neighborhoods or in your homes. But somebody has got to decide this case. What do you think? Do you think you can—

[Juror No. 10]: As a mother of three daughters and a grandmother of an infant daughter, *I don't know that I could be as fair* as one would be from my life situation.

[Prosecutor]: Okay. I appreciate it. Let's let that sit for a second.

[Juror No. 10]: Just so you know.

(Emphasis added.)

{¶ 58} Defense counsel did not follow up with juror No. 10 or attempt to remove her either for cause or by peremptory strike. Later, after providing additional details about the case, the prosecutor asked the prospective jurors, "Is there anyone on this panel who has any reason to believe they can't be a fair and impartial juror?" No prospective juror—including juror No. 10—responded to that question, and juror No. 10 was eventually seated on the jury.

{¶ 59} "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir.2001). This court normally is reluctant to second-guess an attorney's conduct during voir dire and evaluates the conduct as a

matter of trial strategy. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 153. Indeed, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir.2001).

{¶ 60} In *Hughes*, the United States Court of Appeals for the Sixth Circuit considered a claim that defense counsel provided ineffective assistance when he failed to remove a juror on the basis of alleged bias. During voir dire, the juror had indicated that she had a nephew and close friends on the police force. When the trial judge asked whether those relationships would prevent her from being fair, the juror stated: "I don't think I could be fair." *Id.* at 456. Neither the court nor defense counsel attempted to rehabilitate the juror or to obtain an express assurance from her that she could be impartial. *Id.* at 459-461. The Sixth Circuit held that "counsel's failure to respond" to the juror's express admission of bias "was objectively unreasonable" under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Hughes* at 462.

{¶ 61} As in *Hughes*, juror No. 10's uncertainty over whether she could be fair was left unexplored by defense counsel, who never asked a single question of juror No. 10. Her statement that she did not "know that [she] could be as fair" due to her life situation clearly communicated her doubt about her ability to be impartial. It revealed "a state of mind that leads to an inference that [she could] not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997). And because defense counsel failed to follow up, juror No. 10 ultimately gave no "affirmative and believable statement" that she could "set aside [her] opinions and decide the case based on the evidence and in accordance with the law." *Wolfe v. Brigano*, 232 F.3d 499, 503 (6th Cir.2000). I would hold that defense counsel's failure to question juror No. 10 to determine whether she was a biased juror was objectively unreasonable and not the result of trial strategy. *Hughes* at 462. Thus,

defense counsel's failure to respond in any way to juror No. 10's comment that she did not know whether she could be fair was deficient performance.

{¶ 62} But deficient performance is not enough to establish ineffective assistance; the next question is whether Bates was prejudiced by the deficient performance, i.e., whether juror No. 10 was actually biased. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67. As the majority points out, actual bias can be found from a juror's express admission of bias or from circumstantial evidence of the juror's biased attitudes, *see Hughes*, 258 F.3d at 459. When, as here, "the crime itself is likely to inflame the passions of jurors, * * * courts must be vigilant in ensuring that the demands of due process are met." *McKenzie v. Smith*, 326 F.3d 721, 727-728 (6th Cir.2003). In a previous case involving the aggravated murder of a three-year-old, this court observed that "[t]he possibility that one juror might not have fairly considered sentencing options and may have voted for the death penalty solely because [the defendant] murdered a three-year-old child is a risk too great to ignore." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 60. Juror No. 10 expressly admitted, and explained the reasons for, her bias. And there was no attempt to rehabilitate or question her further regarding her bias.

{¶ 63} Appellee, the state of Ohio, contends that juror No. 10's lack of response to the prosecutor's general query about whether any prospective jurors had "any reason to believe they can't be a fair and impartial juror" demonstrates that she "showed no concern about participating as a juror." But juror No. 10's silence in response to general questions regarding fairness and impartiality "did not constitute an assurance of impartiality." *Hughes* at 461; *see also Morgan v. Illinois*, 504 U.S. 719, 734-735, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (rejecting the argument that "general inquiries could detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath").

{¶ 64} Defense counsel's failure to question or move to strike juror No. 10 allowed an actually biased juror to be empaneled for Bates's capital trial. Thus, in addition to the majority's determination that defense counsel's representation was ineffective under *Strickland* regarding juror No. 31, I would hold that defense counsel's representation was ineffective regarding juror No. 10.

_____

**DEWINE, J., dissenting.**

{¶ 65} Today the majority overturns precedent and holds that in at least some circumstances, a defendant may prevail on an ineffective-assistance-of-counsel claim based upon counsel's failure to challenge a prospective juror without any showing that the juror is actually biased against that defendant. It provides virtually no explanation for its abandonment of prior precedent; the most that can be surmised is that the majority does not like the result that our caselaw dictates in this case. I would adhere to our precedent, so I respectfully dissent.

**A Jury Convicts Glen Bates and He Is Sentenced to Death**

{¶ 66} Glen Bates was convicted of aggravated murder and other offenses for killing his two-year-old daughter, Glenara. In the final chapter of the girl's sad life, Bates murdered Glenara by holding her legs and swinging her head against a wall while her half sister looked on. After Glenara's skull had been battered against the wall, someone apparently attempted to stich her head together with a sewing needle, without anesthesia. The next day, her mother took her to the emergency room. On admission, the child had no signs of life—she was cold and pale, had multiple scars, and was totally emaciated. Despite efforts to revive her, she was pronounced dead that afternoon.

{¶ 67} The evidence at trial indicated that Glenara had suffered months of torture and abuse. At birth, Glenara had been taken from her biological parents and placed in foster care. But when she was eight months old, she was returned to her biological parents. She was a healthy 20-pound baby when she left foster care; at

the time of her death 18 months later, she weighed less than 14 pounds. Her half sister testified that Glenara was forced to sleep on the bathroom floor, never toilet trained, and rarely given food to eat.

{¶ 68} By the time of Glenara's death there were so many overlapping sores, scars, and bruises on her body that the coroner was unable to count them all. Nearly every part of Glenara's head was injured. She suffered severe bleeding around the brain, as well as injuries to her neck, cheek, ear, upper lip, and gums. Many of her teeth had been knocked out.

{¶ 69} The rest of her body was abused almost as badly. She suffered countless overlapping injuries to her chest and abdomen, including scars, pattern injuries, and abrasions. She had a prior rib fracture that had begun to heal. She had bite marks on her body and numerous unusual scars to her left nipple. (Bates admitted to detectives that he would play a "game" called "doggy gonna get you" with Glenara in which he would put the emaciated girl in his mouth and shake her while biting down on her body.) She had multiple injuries to her shoulders, forearms, fingers, hands, and wrists. She had burns on her hands, severe diaper rash extending from her lower back down to her thighs, and other injuries that appeared to come from her having been beaten with a belt.

{¶ 70} The jury found Bates guilty of aggravated murder with a capital specification, and the case proceeded to sentencing. Three people testified on Bates's behalf: his mother, the mother of one of Bates's sons, and a friend. The testimony revealed that Bates had been very involved in church activities during his youth—he participated in the Boys to Men ministry, was a junior deacon, sang in the choir, and went to Bible study. Bates was described as being a loving father to his son. He is a high school graduate and had been employed prior to the offense. Bates did not make an unsworn statement, and no other mitigation evidence was presented. Overall, the evidence presented with respect to Bates's background did little to explain or mitigate his commission of this crime.

{¶ 71} After considering the mitigation evidence, the jury unanimously recommended the death penalty. The trial court judge conducted an independent review of the evidence and adopted the jury's recommendation.

{¶ 72} The majority reverses Bates's convictions based on potential racial bias on the part of juror No. 31. During jury selection, prospective jurors were asked to fill out a questionnaire containing 131 questions. The majority focuses on two answers that raise the possibility of racial bias. In one answer, juror No. 31 checked "strongly agree" when asked if some races tend to be more violent than others and in explaining the answer wrote "Blacks." In response to a question about whether there were some racial groups that she does not feel comfortable being around, she wrote, "Sometimes black people." On another question, however, she responded that she had never "had a negative or frightening experience with a person of another race." And in response to another question, she indicated that she had not "been exposed to persons who exhibited racial, sexual, religious and/or ethnic prejudice."

{¶ 73} She also indicated on the questionnaire that she had a disabled adult child, who lived with her. And in response to other questions, she said that she had a son who suffered from "mental issues."

{¶ 74} Juror voir dire was conducted in groups of 12. Defense counsel asked juror No. 31's group if there was anyone who could not be fair and impartial, and he received no affirmative responses. Defense counsel did not, however, conduct individual voir dire on juror No. 31, and she was not asked to explain her race-based answers on her juror questionnaire. Defense counsel did not challenge juror No. 31 for cause. And though defense counsel utilized five of the six peremptory challenges that were available, counsel did not use a peremptory challenge to remove juror No. 31.

**Ineffective Assistance of Counsel Based on Jury Voir Dire**

{¶ 75} To prevail on his ineffective-assistance-of-counsel claim, a defendant is required to show both that his counsel was deficient *and* that he was prejudiced by the deficient representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the United States Supreme Court has cautioned that "the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), quoting *Strickland* at 690.

{¶ 76} In this case, however, the majority concludes that Bates need only comply with the first part of the test: it determines counsel was deficient for not asking individual questions of juror No. 31 about the race-based answers on her questionnaire, and it then presumes that Bates was prejudiced as a result.

{¶ 77} Traditionally, we have granted counsel wide latitude in the conduct of voir dire. This is because " '[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Thus, we have "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *Id.* at ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1988); *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 50.

{¶ 78} And when, as here, race is not an issue in the trial, this court has consistently deferred to an attorney's tactical decision whether to question jurors about racial bias during voir dire. *See*, *e.g.*, *State v. Hale*, 119 Ohio St.3d 118,

2008-Ohio-3426, 892 N.E.2d 864, ¶ 218; *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 143; *State v. Smith*, 89 Ohio St.3d 323, 327, 731 N.E.2d 645 (2000); *State v. Watson*, 61 Ohio St.3d 1, 13, 572 N.E.2d 97 (1991), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997). Indeed, we have upheld convictions when trial counsel asked no questions about race even though the defendant was accused of an interracial crime. *See, e.g.*, *State v. Sanders*, 92 Ohio St.3d 245, 274, 750 N.E.2d 90 (2001); *Smith* at 327-328. Nonetheless, the majority concludes that by failing to question juror No. 31 about her responses on the questionnaire, counsel's performance was "insufficient under the circumstances." Majority opinion at ¶ 32.

### The Majority Presumes Prejudice

{¶ 79} Under *Strickland*, once the majority concluded that counsel was deficient it was required to determine if this deficient performance prejudiced the defendant. When determining whether a defendant has been prejudiced by his attorney's deficient representation, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *see also State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). In other words,

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer * * * would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

28

*Strickland* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112, 131 S.Ct. 770, 178 L.Ed.2d 624. And when reviewing for prejudice, "a court should presume * * * that the judge or jury acted according to law." *Strickland* at 694.

{¶ 80} Here, it is clear that Bates cannot satisfy the traditional prejudice standard. The state presented substantial evidence of his guilt. Glenara's half sister testified that she saw Glenara's "head get banged" when Bates held Glenara's legs and swung her against a wall. Glenara died from the resulting head injury the following day. There was no evidence that anyone other than Bates caused Glenara's head injury; indeed, Bates's defense at trial essentially was that it was an accident. The jury watched Bates's interviews with the police. During the interviews, Bates repeatedly denied that he had ever witnessed or caused a head injury to Glenara. Then he changed his story, telling one of the detectives that he accidentally dropped her on her head while playing with her. The doctor who performed the autopsy contradicted this account, testifying that it would be unusual for a short linear fall to result in the kind of subdural hemorrhages present on Glenara's head and that the injuries were more consistent with the child being swung against the wall than being dropped on her head. Given this clear evidence of guilt, it is simply not likely that a different juror would have voted to acquit or to convict him of a lesser included offense.

{¶ 81} Nor would Bates fare any better with respect to the sentence. The jury found beyond a reasonable doubt that Bates was the principal offender in the commission of the aggravated murder of a child under the age of 13, so the mitigating factor that he participated to a lesser degree does not apply. *See* R.C. 2929.04(B)(6). The nature and circumstances of Glenara's death do not offer anything in mitigation. There was no evidence that Glenara induced or facilitated the murder, no evidence of duress, coercion, or provocation, and no evidence that

Bates was suffering from any mental disease or defect. *See* R.C. 2929.04(B)(1) through (3). Bates was 33 at the time of the murder, so youth is not a factor. *See* R.C. 2929.04(B)(4). No evidence was presented as to whether Bates had any prior criminal convictions or juvenile adjudications. *See* R.C. 2929.04(B)(5). There is little in Bates's background that is mitigating—rather, the evidence presented suggests that Bates had generally lived a life devoid of significant trauma.

{¶ 82} Indeed, when it is alleged that a potentially biased juror was allowed to sit on a jury, the *Strickland* prejudice test is a difficult one to meet. Absent juror testimony, there is almost no way to know if an improper bias influenced juror decision making.

{¶ 83} The United States Supreme Court has never addressed the issue whether prejudice may be presumed under *Strickland* when a biased juror is allowed to sit on a jury because of a failure by defense counsel. In *Strickland*, the court identified only a few limited circumstances in which prejudice would be presumed: when there has been "[a]ctual or constructive denial of the assistance of counsel altogether," when the state has interfered with counsel's assistance, and when counsel has labored under a conflict of interest. 466 U.S. at 692, 104 S.Ct. 2052, 80 L.Ed.2d 674; *see also Weaver v. Massachusetts*, ___ U.S. ___, 137 S.Ct. 1899, 1915, 198 L.Ed.2d 420 (2017) (Alito, J., concurring in the judgment) ("The Court has relieved defendants of the obligation to make this affirmative showing in only a very narrow set of cases in which the accused has effectively been denied counsel altogether").

{¶ 84} Although the United States Supreme Court has never held that *Strickland* prejudice should be presumed based on the presence of a biased juror, it has held that when an objection is properly preserved, the presence of a biased juror would mandate the reversal of a conviction. *Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *United States v. Martinez-Salazar*, 528 U.S. 304, 316-317, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). Based on this principle,

a number of circuit courts have expanded the categories in which prejudice may be presumed under *Strickland* to include instances when there has been a showing that a juror was actually biased against a particular defendant. *See*, *e.g.*, *Miller v. Francis*, 269 F.3d at 616; *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir.1995); *but see People v. Manning*, 241 Ill.2d 319, 333, 948 N.E.2d 542 (2011) (refusing to adopt a presumption of prejudice based on juror bias).

**{¶ 85}** We adopted this type of actual-bias standard in *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828. There we held that a defendant could establish prejudice under *Strickland* by showing that counsel allowed the impanelment of a juror who was actually biased against the defendant. *Id.* at ¶ 67. We explained that "[w]hen a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.' " (Emphasis added in *Mundt*.) *Id.*, quoting *Miller v. Francis* at 616.

**{¶ 86}** We applied the actual-bias standard in *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, another death-penalty case with facts remarkably similar to this one. In that case, we recounted responses that a juror had made on his juror questionnaire:

> The questionnaire asked, "Is there any racial or ethnic group that you do not feel comfortable being around?" Carroll answered "yes," and explained: "Young black men with their pants down to their knees." The questionnaire also asked, "Have you ever had a negative or frightening experience with a person of another race?" Carroll answered "yes," and explained: "At a gas station—black man appeared—'Give me your wallet or die right here.' " Another question asked for thoughts on "the issue of racial discrimination against African-Americans in our society." From the several

31

options offered as answers, Carroll chose the one that read "[A] very serious problem."

*Id.* at ¶ 209.

{¶ 87} During voir dire, the prosecutor asked the juror about the robbery, but no questions were asked about the other comments. We concluded that Pickens's attorneys were deficient for failing to follow up on the responses on the questionnaire and question the juror "about his racially based comments to determine whether he was a biased juror." *Id.* at ¶ 212. Nonetheless, we refused to presume prejudice. Instead, we restated that to establish prejudice, Pickens " ' "*must* show that the juror was *actually biased* against him." ' " *Id.* at ¶ 213, quoting *Mundt* at ¶ 67, quoting *Miller v. Francis*, 269 F.3d at 616. We noted that under questioning, the juror had said nothing to indicate that he harbored a racial bias as a result of the robbery that occurred. *Id.* And we further explained that "Carroll's comment about '[y]oung black men with their pants down to their knees' does not necessarily reflect bias against Pickens personally." *Id.* In declining to find actual bias, we stated that "[w]hether failure to strike [the juror] from the panel was prejudicial is speculative because it is possible that he might have been rehabilitated under further questioning." *Id.*, citing *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 213.

{¶ 88} The majority today overrules *Pickens* (and presumably *Mundt* as well) and holds that when an attorney fails to follow up on racially based comments on a juror questionnaire, prejudice will be presumed without any showing that the juror is actually prejudiced against the defendant. In effect, the two-part *Strickland* inquiry is collapsed into a single step. If counsel is deficient for failing to adequately inquire into potential racial bias on the part of the juror, there is no need to show anything more—the prejudice inquiry is eliminated altogether. The defendant need not show that the attorney's error affected the outcome of the trial

or even that a juror who was actually biased against the defendant sat on the jury: the potential of juror bias is sufficient.

{¶ 89} As far as I am aware, no other court has done what the majority does today in holding that potential juror bias is sufficient to constitute a Sixth Amendment violation. The Utah Supreme Court similarly was unable to find any support for the position that is adopted by the majority today, explaining, "We are aware * * * of no case from any jurisdiction supporting the * * * expansion of the Sixth Amendment to require reversal of a guilty verdict based on possible juror bias." *State v. King*, 2008 UT 54, 190 P.3d 1283, ¶ 18. (The question before that court, which it answered in the negative, was nearly identical to the one before us today: "whether *Strickland* prejudice may be presumed when a lawyer fails to sufficiently probe prospective jurors who exhibit the potential for bias," *id.* at ¶ 13.)

{¶ 90} In removing the requirement that a defendant establish actual bias, the majority creates perverse incentives for defense counsel. If a juror questionnaire indicates potential bias, the rational move for defense counsel is not to question that juror at all. That way, the defendant can see what happens at the first trial and if the verdict is unfavorable receive an automatic retrial. *See State v. Hadley*, 815 S.W.2d 422, 423 (Mo.1991) ("The rule requiring contemporaneous objections to the qualifications of jurors * * * serves to minimize the incentive to sandbag in the hope of acquittal and, if unsuccessful, mount a post-conviction attack on the jury selection process").

{¶ 91} Rather than defend the novel legal position adopted by the majority, the first concurring opinion takes exception with the dissent's recounting of the facts of the crime. It doesn't argue that the facts are incorrect or misleading. Just the opposite. Its objection is that the dissent's description of what happened is too accurate. Apparently, the concurrence believes that principles of "equal justice" are best served by glossing over precedent and sanitizing the facts. First concurring opinion at ¶ 43. Its protests, however, cannot obscure how markedly the majority

departs from our prior precedent. If we apply our caselaw, there can be little question that Bates has failed to meet his requirement of showing actual bias. There is nothing in the record from which to conclude that juror No. 31—who is presumed to have acted in accordance with the law—was unable to render a fair and impartial verdict in this case. She " 'never stated that she could not be fair.' " *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 68, quoting *Miller v. Francis*, 269 F.3d at 617. She never stated that she could not impartially apply the law to the case in front of her. She never indicated that she was biased against Bates.

**{¶ 92}** No question, this case presents difficult facts. It is hard to understand why defense counsel chose not to pursue an individualized inquiry of juror No. 31. But our precedent requires a showing of actual bias before a jury verdict will be reversed for juror bias. I would adhere to this precedent. Because the record does not demonstrate that juror No. 31 was "actually biased against [the defendant]," *see Mundt* at ¶ 67, I would reject Bates's 17th proposition of law and proceed to review his remaining claims.

KENNEDY, J., concurs in the foregoing opinion.

—————————————

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Assistant Prosecuting Attorney, for appellee.

Todd W. Barstow and Roger W. Kirk, for appellant.

Squire Patton Boggs, L.L.P., and Richard S. Gurbst, urging reversal for amicus curiae, NAACP Legal Defense & Educational Fund, Inc.

—————————————