[Cite as *State v. Knight*, **2022-Ohio-1787.**]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                          Court of Appeals No.  E-21-017

　　　　Appellee                                  Trial Court No.  2019-CR-341

v.

Darius Knight                                       **DECISION AND JUDGMENT**

　　　　Appellant                                  Decided:  May 27, 2022

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

John M. Felter, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Darius Knight, appeals the judgment entered by the Erie County

Court of Common Pleas, sentencing him on charges of kidnapping, importuning, and

gross sexual imposition, and on a repeat violent offender specification.  For the reasons

that follow, we affirm the judgment of the trial court.

## Statement of the Case

{¶ 2} This case arises from the sexual assault of a minor, G.A., on or about August 17, 2019. On September 11, 2019, appellant was indicted on: (1) one count of kidnapping, a first-degree felony, in violation of R.C. 2905.01(A)(4) and (C)(1); (2) one count of importuning, a second-degree felony, in violation of R.C. 2909.07(A) and (F)(2); (3) two counts of gross sexual imposition, third-degree felonies, in violation of R.C. 2907.05(A)(4) and (C)(2); and (4) one count of unlawful restraint, a third-degree misdemeanor, in violation of R.C. 2905.03(A) and (C). On November 14, 2019, a superseding indictment was issued, which attached to the kidnapping charge a repeat violent offender ("RVO") specification and a sexually violent predator specification. The count for unlawful restraint was subsequently dismissed at the state's request.

{¶ 3} On December 16, 2019, the state filed a notice of intent to use Evid.R. 404(B) evidence, notifying the defense of the state's intention to offer evidence of appellant's conditions of parole and his violations of the same in order to show appellant's motive, intent, and/or plan to commit the charged offenses. Just prior to trial, defense counsel filed a motion in limine to prevent the state from introducing into evidence or referencing appellant's prior convictions, parole conditions, or testimony from a parole officer, pursuant to Evid.R. 404(B) and Evid.R. 403. In response, the state argued that the testimony that appellant sought to restrict was also admissible to show that the prior conviction for which appellant was on parole was an element of the offense

2.

of importuning. The state further argued that because the parties agreed to stipulate that appellant had previously been convicted of a sexually oriented offense, the risk of prejudice from the parole officer's testimony was minimal and did not outweigh its relevance. Ultimately, the trial court permitted limited testimony by the parole officer only as to the fact that she was appellant's parole officer in connection with the stipulated prior conviction and that, as a result of that conviction, appellant was not to have contact with children.

{¶ 4} At trial, on April 9, 2021, during a break in the testimony of the state's second witness, Juror No. 3 notified the court administrator about a potential issue. Outside the presence of the rest of the jury, Juror No. 3 disclosed that during her early teens, her uncle's friend made a sexual advance towards her, which she rebuffed, and which she "did not progress from there." Juror No. 3 explained that the incident happened a couple of decades earlier, and that no police report was ever filed, so she did not think to disclose this information during voir dire. She further stated, "I feel like I can be impartial in this situation." The trial court then questioned Juror No. 3, and she again confirmed that she could be fair and impartial to both appellant and the state, and that the incident would not impact her in any way when handing down a decision in this case. Thereafter, both sides confirmed that they were prepared to proceed with the trial.

{¶ 5} On April 16, 2021, appellant was convicted on one count of kidnapping, one count of importuning, and two counts of gross sexual imposition. The state filed its

3.

sentencing memorandum on May 3, 2021, asking the court to sentence appellant for each offense separately. After moving for an extension, defense counsel filed a sentencing memorandum arguing that the kidnapping and gross sexual imposition offenses should merge and that the two gross sexual imposition offenses should merge, as well.

{¶ 6} On May 10, 2021, the trial court conducted a hearing on the RVO specification. The state presented testimony from appellant's parole officer and admitted a certified copy of his prior conviction for attempted rape in case No. 2011-CR-0530. The trial court found appellant to be a repeat violent offender, subject to sentencing under R.C. 2929.14(B)(2), et seq.

{¶ 7} A sentencing hearing was held on May 13, 2021. The trial court determined that the two counts of gross sexual imposition would not merge because appellant engaged in sexual contact involving more than one erogenous zone. The trial court also declined to merge the kidnapping and gross sexual imposition counts, because there were separate and identifiable harms resulting from the offenses. The trial court then sentenced appellant to serve: (1) a 10-year mandatory term of imprisonment for the kidnapping charge; (2) an 8-year mandatory term of imprisonment for the importuning charge; and (3) 5-year terms of imprisonment for each of the charges for gross sexual imposition. The trial court ordered the sentences to run consecutively, for an aggregate minimum sentence of 28 years, and an aggregate maximum sentence of 33 years. The

4.

trial court further sentenced appellant to serve ten years in prison for the RVO specification.

{¶ 8} Appellant timely filed a notice of appeal on June 3, 2021.

**Statement of the Facts**

{¶ 9} Officer Elijah Coe of the Sandusky Police Department testified that on August 18, 2019, he was dispatched to a call at 1328 Putnam Street for a possible sex offense. When Coe arrived, he met with G.A.'s mother, S.S., who explained that (then 11-year-old) G.A. had been walking around collecting donations for charity the day before, when she met a man on Barker Street, who brought her into his house. S.S. stated that G.A. told her that when G.A. went into the man's house, the man locked the door behind her, and then forced her to kiss him, put her on his lap, and began rubbing her around on his body. S.S. also stated that G.A. told her that the man had felt around G.A.'s chest, and had unbuttoned her pants and reached down into them before realizing that she was on her period, at which point he let her go. Coe testified that G.A. then showed him photos that she had taken of the house where this happened to her. According to Coe, G.A. described the man as a black male, around six feet tall, with a skinny build and short hair. Coe further testified that he drove by the house that was in G.A.'s photos and got the address of 1823 Barker Street from the mail box. At the house, he noticed a male sitting on the porch who matched G.A.'s description and whom he later identified at trial as appellant. At some point during his investigation, Coe determined

5.

that appellant was the only person linked to the address who matched the description that had been provided by G.A.

{¶ 10} Carol Scherger of the Seneca County Department of Job and Family Services also testified at trial. Scherger testified that she interviewed G.A. about the sexual abuse allegations on August 21, 2019. The interview was played at trial. During the interview, G.A. disclosed that she had gone out to collect donations for a charity involving cancer. She stated that she had been sitting on a neighbor's porch, when a man came over and started talking to her. After the woman donated some money, G.A. started to walk home. The man yelled to her to come back, and she turned around and went to his house. G.A. stated that the man gave her a popsicle and that they sat outside on his porch for a while. He then asked her to come inside, and she did, because she thought that he was going to give her a donation. G.A. said that once she was inside the house, the man locked the door and she started freaking out. He asked her if she could keep a secret, and offered her some food. G.A. said that she told the man she had heart problems and that he asked her to give him a hug. She said that the man then grabbed her butt and squeezed it, hugged her, made her kiss him, lifted her up and sat her on his lap, facing him, and then began moving her against him. G.A. also disclosed that the man had asked to see the scars on her chest and had lifted up her shirt to see them. He also asked her to take off her shorts, but she refused and backed away from him. The man then picked her up and put her back on his lap and unbuttoned her pants. G.A. stated that the

6.

man grabbed her sides and tried to take her shorts off again, but stopped when he realized that she was on her period. G.A. described the man as tall and black, with short hair. During the interview, an officer brought in a photo array, and G.A. quickly identified the man, stating that she was confident that he was the man who had attacked her.

{¶ 11} Debra Koler, a parole officer for the state of Ohio, testified that there was a stipulation between the parties that appellant had previously been convicted of a sexually oriented offense on or about April 19, 2012. Koler testified that as a result of that conviction, she served as appellant's parole officer, meeting with him three times per month. During those meetings, she advised appellant that he was not permitted to have any unsupervised contact with minors and that any supervised contact had to be approved.

{¶ 12} Patricia Burkhart, who lived at the corner of Putnam and Barker Street, testified that she was home on August 17, 2019, and that, on that date, G.A. had knocked on her door asking for a donation for the Special Olympics. Burhkhart testified that she went inside her house to get a few dollars, and that when she came back outside, appellant, who was her neighbor, was coming across the street, heading towards her porch. Burkhart testified that appellant asked her for a cigarette, and that she sat down with him on the porch to smoke, while G.A. stood on the sidewalk. According to Burkhart, appellant talked to G.A. two or three times. She described G.A. as being "socially awkward," and testified that she thought that G.A. was "maybe a little mentally

7.

slow." Burkhart testified that they were out on her porch for about 30 minutes, before she had to go get ready for a wedding. Burkhart testified that when she got out of the shower 10-15 minutes later, she saw G.A. sitting on appellant's porch, alone and eating an ice pop. Burkhart later saw appellant on the sidewalk, and he asked her whether she knew that G.A. was only 11 years old and that she had heart surgeries that left scars on her chest.

{¶ 13} L.A., G.A.'s father, testified that G.A. was staying with him at his home on Putnam Street on the weekend of August 17, 2019. He testified that G.A. had mentioned that she was going to collect money for some charity, but he admitted that he had not paid close attention to what she had said to him. L.A. testified that he later learned from G.A.'s mother that G.A. had disclosed that she had been sexually assaulted. He testified that he was aware that G.A. had identified appellant as her attacker, but that he did not know appellant personally.

{¶ 14} Jessica Sherrard, a service and support administrator with the Erie County Board of Developmental Disabilities, testified that after learning of appellant's arrest, she visited him at the Erie County jail, on August 26 and 27, 2019. Sherrard testified that on both occasions, appellant: (1) denied that a girl had entered his home on August 17, 2019; (2) claimed that he had already been sitting on the neighbor's porch when the girl approached asking for donations; and (3) admitted that he and the girl had gone back to his porch and that he had given her a popsicle. Sherrard testified that when she told

8.

appellant that the interaction was caught on video, he still claimed that the girl had never gone into his home.  Appellant also told Sherrard that he knew he was not supposed to be around children.

{¶ 15} Detective Ken Nixon of the Sandusky Police Department testified that he was assigned to investigate G.A.'s case after Officer Coe took G.A.'s initial statement. Nixon testified that G.A.'s mother sent him two pictures that G.A. had taken of the home at 1823 Barker Street, where G.A. was sexually assaulted.  Nixon further testified that, based on his investigation, appellant lived alone at 1823 Barker Street on August 17, 2019.  Nixon explained that Carol Scherger had conducted a forensic interview of G.A., which Nixon had monitored from another room.  Nixon testified that during that interview, another officer showed G.A. a photo array of six individuals, and that, from the array, G.A. had identified appellant as the person who had sexually assaulted her. Nixon stated that when he went to arrest appellant, Henry Schonhardt, one of appellant's neighbors, came out and told the officer that he had security cameras.  Thereafter, Nixon collected video footage that had been recorded on Schonhardt's cameras.  The footage that was played for the jury showed G.A. coming from Patricia Burkhart's house, with something catching her attention that caused her to stop on the sidewalk, and then walking back down the street towards appellant's house.  The video footage also showed appellant, after leaving Burkhart's house, on his own porch, going inside his home.  The footage showed appellant coming back outside a few minutes later, walking to the edge

9.

of his porch, making a motion towards G.A., indicating for her to come over, and then sitting down on the porch. Next, the footage showed G.A. walking onto appellant's porch, before ultimately entering his home. On cross-examination, Nixon admitted that the footage showed that there was a period of four to five minutes during which G.A. remained alone on appellant's porch while appellant went inside his house, but Nixon explained that G.A. said she had stayed on the porch because she believed that appellant was going inside to get money to donate. Nixon testified that the video footage showed that appellant and G.A. remained inside his house together for approximately ten to eleven minutes. Nixon also testified that during his investigation, he collected some recorded conversations between appellant and Jessica Sherrard at the jail. Nixon testified that during those conversations, appellant was adamant that the girl had never gone inside his house. Nixon further testified that when he arrested appellant at his home, on August 21, 2019, appellant again denied that there had been a child in his home.

{¶ 16} G.A.'s mother, S.S., testified that G.A. has several health issues, including a heart condition, for which she has undergone surgeries, and developmental problems. S.S. testified that on August 18, 2019, she received a call from her sister, who told her what had happened to G.A. the day before, while G.A. was at her father's house. S.S. went immediately to Sandusky and called the police on the way. When S.S. arrived at G.A.'s father's home, G.A. tried to tell S.S. about what had happened to her, but because G.A. was crying so hard, S.S. could barely understand her. G.A. told her mother that she

10.

was out collecting money for a fundraiser for school, and that a man in the neighborhood had asked her to come over. G.A. further told her mother that she went into the man's house because she thought he was going to give her money for the fundraiser, but instead he asked her to sit on his lap, kissed her, and tried to get into her pants, before realizing she was on her period. S.S. testified that when she asked G.A. where this had happened, G.A. showed her the pictures on her phone of the house she had gone into. S.S. testified that she took G.A. to counseling after the incident, because she noticed marked changes in her daughter, including two attempts to take her own life, nightmares, and difficulty sleeping.

{¶ 17} G.A., who was twelve-years-old at the time of the trial, testified that on August 17, 2019, she had asked her father if she could go collect donations. She testified that she talked to Patricia Burkhart, who had given her a donation, and that after she left Burkhart's house, she was motioned back by appellant, and that she went to his house because she believed he was going to give her a donation, as well. G.A. testified that she went inside the house and that he locked the door, which freaked her out. She recalled that he asked her if she could keep a secret, hugged her, grabbed her and kissed her, grabbed and squeezed her butt, put her on his lap facing him, and moved her around against him. G.A. also testified that appellant grabbed her by the waist and tried to pull her shorts down, and although she said no, he pulled her in closer and tried to do it again. G.A. further testified that appellant asked her about her heart surgery and asked to see the

11.

scar on her chest, which she showed him without lifting her shirt. G.A. explained that after she left the house, she remained on the porch for several minutes because she was still in shock. She testified that she took two pictures on her phone of the house where the incident had happened. G.A. testified that she later told Carol Scherger about what had happened to her, and that she was shown pictures of people and asked if she could identify the person who had sexually assaulted her. G.A. testified that she had been able to identify the person who had assaulted her, and that she was confident that it was him. Although G.A. was unable during her initial trial testimony to identify appellant as her attacker, on redirect examination, she ultimately did agree that it was appellant who had done the things to her that she had previously described in her testimony.

### Assignments of Error

{¶ 18} Appellant asserts the following assignments of error on appeal:

I. Appellant was denied effective assistance of counsel.

II. The verdict was against the manifest weight of the evidence.

III. The Trial Court erred by allowing Appellant's parole officer to testify.

IV. The cumulative effect of the errors committed at trial denied the Appellant his right to a fair trial.

V. The Court erred by imposing a sentence contrary to law, in that it failed to merge counts and improperly applied the Repeat Violent Offender ("RVO") specification and the Reagan Tokes law.

12.

**Analysis**

{¶ 19} In his first assignment of error, appellant contends that his trial counsel was ineffective for: (1) failing to object or request the removal of the juror who failed to notify the court or counsel during voir dire that she had been the victim of sexual abuse as a child; (2) failing to move the court for an analysis to determine if an NGRI plea was plausible; (3) failing to move the court to allocate funds for appellant to retain a private investigator to conduct a defense investigation; and (4) failing to move the court to allocate funds to retain an expert witness in child psychology to testify as to the unreliability of the testimony of children as witnesses.

{¶ 20} To prevail on a claim of ineffective assistance of counsel, appellant must demonstrate: "(1) deficient performance by counsel; i.e., that counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the result of the proceeding would have been different." *State v. Wallace*, 8th Dist. Cuyahoga No. 105123, 2017-Ohio-7322, ¶ 6, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113. A court that is performing a *Strickland* analysis "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 151, quoting *Strickland* at 689. "Decisions on strategy and trial tactics are generally granted a

wide latitude of professional judgment," and it is "not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers." *State v. Mhoon*, 8th Dist. Cuyahoga No. 98832, 2013-Ohio-2090, ¶ 26, citing *Strickland* at 689.

{¶ 21} Appellant initially claims that his trial counsel was ineffective for failing to object or request the removal of Juror No. 3. To satisfy *Strickland*'s first prong, appellant "must demonstrate that defense counsel's performance was objectively unreasonable in light of counsel's failure to question or strike the juror[] at issue." *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 25. To show prejudice, he "*must show that the juror was actually biased* against him." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67 (emphasis in original). "Actual bias is 'bias in fact' – the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Bates* at ¶ 25, quoting *United States v. Torres*, 128 F.3d 38, 43 (2nd Cir.1997). Thus, appellant "must prove that at least one of the jurors at his trial, because of the juror's partiality or biases, was not 'capable and willing to decide the case solely on the evidence' before that juror." *Bates* at ¶ 25, quoting *Smith v. Phillips*, 455 U.S. 207, 217, 102 S.Ct. 940, 71 L.Ed.3d 78 (1982).

{¶ 22} Here, Juror No. 3 notified the court administrator during a break in the testimony of the second witness at trial that she had a potential issue. Juror No. 3 then disclosed that she believed she should bring to the court's attention the fact that on one occasion, decades earlier, while she was in her early teens, one of her uncles' friends

14.

made a sexual advance towards her, which she declined, and which "did not progress from there." Juror No. 3 explained that because the incident had happened many years earlier and because no police report was ever filed, she had not thought to disclose the incident during voir dire. After her disclosure to the court and to counsel, Juror No. 3 immediately volunteered that she felt she could "be impartial in this situation." In response to additional questioning by the court, Juror No. 3 again confirmed that she could be fair and impartial to both appellant and the state. When asked by the court whether the disclosed incident would "in any way at all weigh in [her] mind when handing down a decision in this case," Juror No. 3 answered, "No, it would not."

{¶ 23} Under circumstances such as the ones at hand, "[o]ur concern is whether continuing trauma [from a prospective juror's sexual assault] would prevent a juror from being fair and impartial; [i]t is not [simply] a question of whether there is an indication of continuing trauma, but, rather, whether continuing trauma prevents a juror from being fair and impartial." *State v. T.L.*, 10th Dist. Franklin No. 19AP-196, ¶ 23. In conducting this analysis, we are mindful that courts have repeatedly declined to adopt a per se rule that would exclude victims of sexual assault from serving as jurors in cases involving sexual assault. *Id.* at ¶ 25, *see also*, *State v. Zerla*, 10th Dist. Franklin No. 91-AP-562, 1992 WL 55433 (Mar. 17, 1992) ("We do not mean to imply that all rape victims are presumed to be biased.").

{¶ 24} Here, Juror No. 3 confirmed multiple times that she could be fair and impartial, and, beyond that, there was nothing in her statements to suggest that her decades-old sexual assault experience resulted in any kind of continuing trauma that would prevent her from being fair and impartial. *See T.L.* at ¶ 24 (Finding no abuse of discretion in the trial court's denial of challenges for cause with respect to prospective jurors who had experienced sexual assault where none of the prospective jurors indicated that continuing trauma would prevent them from being fair and impartial.); *State v. Dennis*, 8th Dist. Cuyahoga No. 104742, 2018-Ohio-2723 (Finding appellate counsel was not ineffective for rejecting proposed assignment of error on juror impartiality where jurors affirmed they could be impartial despite being victims of sexual assault, where the incidents of sexual abuse were in the long past, and where there was no evidence of continuing trauma.); *Wallace* at ¶ 12 (Juror's statement that she would be able to remain impartial despite past experience as a victim of sexual assault deemed credible where juror never gave any indication that she was still suffering from any resulting emotional trauma.). Nor was there any other evidence to suggest that Juror No. 3 was not capable and willing to decide the case solely on the evidence before her. *See Bates* at ¶ 25. Because there is no evidence of "actual bias," appellant has failed to demonstrate that he was prejudiced by Juror No. 3's presence on the jury.

{¶ 25} We also find that appellant has failed to demonstrate that defense counsel's performance was objectively unreasonable in light of counsel's decision not to question

16.

or object to Juror No. 3's continued presence on the jury. *See Bates* at ¶ 25; *see also*, *State v. Mhoon*, 8th Dist. Cuyahoga No. 98832, 2013-Ohio-2090, ¶ 26, citing *Strickland* at 689 ("Decisions on strategy and trial tactics are generally granted a wide latitude of professional judgment."). Because appellant has failed to show either deficient performance of counsel or prejudice, his claim that his trial counsel was ineffective for failing to object or request the removal of Juror No. 3 is dismissed as meritless. *See Wallace* at ¶ 6.

{¶ 26} Appellant's second claim of ineffective assistance arises from trial counsel's failure to move for an analysis to determine whether a plea of not guilty by reason of insanity was possible. When appellant began to enter a guilty plea at a hearing held on October 16, 2020, the trial court raised the issue of appellant's competency. Defense counsel informed the court that he had explored the issue of competency with appellant's caseworker, Jessica Sherrard, and that he felt appellant was competent to proceed. Defense counsel further added that he learned that appellant had previously been convicted in another case in which he had been determined to be competent. Nonetheless, the trial court stopped the plea hearing and ordered an evaluation for competency. Dr. Thomas G. Sherman subsequently conducted an evaluation of appellant, and appellant was determined to be competent. Appellant offers no evidence that he would have been found not guilty by reason of insanity had trial counsel pursued such a defense. Thus, appellant has failed to demonstrate that counsel acted objectively

17.

unreasonably by not pursuing a not guilty by reason of insanity defense or that there is a reasonable probability that, but for counsel's actions, the result of the proceedings would have been different. *See Wallace* at ¶ 6; *see also, State v. Jackson*, 8th Dist. Cuyahoga No. 80299, 2002-Ohio-2711, ¶ 16 (rejecting ineffective assistance claim for failing to file a not guilty by reason of insanity plea where defendant provided no evidence that it would have succeeded). Appellant's second claim of ineffective assistance is properly dismissed.

{¶ 27} Appellant next claims that his trial counsel was ineffective for failing to move for funds to retain a private investigator to conduct a defense investigation. Appellant offers no explanation at all as to how a private investigator would have helped his case. He has, therefore, utterly failed to establish that his counsel's performance was objectively unreasonable or that there was a reasonable probability that, had counsel retained a private investigator, the result of the proceedings would have been different. *See Wallace* at ¶ 6; *see also, State v. Kuck*, 2d Dist. Drake No. 2017-CA-15, 2018-Ohio-320, ¶ 18 (rejecting ineffective assistance claim for failing to hire a private investigator where there was nothing to support a finding that counsel failed to properly investigate the case); *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 91 (rejecting ineffective assistance claim for failing to hire a private investigator where defendant failed to show how a private investigator would have helped his case or how he was

18.

harmed). Appellant's third claim of ineffective assistance is without merit and is dismissed.

{¶ 28} Finally, appellant claims that his trial counsel was ineffective for failing to retain an expert witness in child psychology. As this court has recognized, "[t]he decision of whether or not to call an expert is generally considered a matter of trial strategy." *State v. Heiney*, 6th Dist. Lucas No. L-19-1115, 2020-Ohio-2761, ¶ 29 (citations omitted). "Indeed, 'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *Id.* at ¶ 29, quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E. 2d 225 (1993).

{¶ 29} Here, appellant has failed to establish that his trial counsel's performance was deficient simply because he did not move to retain an expert witness on the reliability of children witnesses. There is ample evidence in the record showing an attempt on the part of appellant's trial counsel to discredit G.A. and her testimony by pointing to alleged discrepancies in her story. Furthermore, appellant has failed to establish that he was prejudiced by his counsel's decision not to use an expert witness. Appellant fails to demonstrate any specific evidence that such an expert might have presented to assist him that was not established through cross-examination of the state's witnesses, nor has he explained why such would have prompted the jury to reach a different result. *See State v. Miller*, 3d Dist. Crawford No. 3-03-26, 2004-Ohio-1947, ¶ 21 (finding that trial counsel was not ineffective for failing to call an expert witness on

19.

the reliability of child witnesses where the record showed counsel attempted to discredit the witness's testimony on cross-examination.). Thus, appellant's fourth and final claim of ineffective assistance is dismissed as meritless. For all of the foregoing reasons, appellant's first assignment of error is found not well-taken.

{¶ 30} Appellant argues in his second assignment of error that the verdict was against the manifest weight of the evidence. When a conviction is challenged as being against the manifest weight of the evidence, "the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 6th Dist. Wood No. WD-15-017, 2016-Ohio-223, ¶ 8, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 67 N.E.2d 541 (1997). The appellate court sits as the "thirteenth juror" and may disagree with the fact-finder's resolution of conflicting testimony. *Thompkins* at 387. However, the discretionary power to reverse a conviction on manifest weight grounds should be exercised only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 31} In the instant case, appellant broadly asserts "that the primary witness against him was the victim and that serious questions exist with regard to her credibility." In support of this broad assertion, appellant specifically points to: (1) some conflicting

20.

testimony about which charity G.A. was collecting money for on August 17, 2019; and (2) the fact that G.A. was initially unable to identify appellant at trial.

{¶ 32} In considering this assignment of error, we are cognizant that "'an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Petty*, 10th Dist. Franklin No. 15AP-950, 2017-Ohio-1062, ¶ 63, quoting *State v. Rankin*, 10th Dist. Franklin No. 10AP-1118, 2011-Ohio-5131, ¶ 29. "The determination of weight and credibility of the evidence is for the trier of fact," because "'the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.'" *State v. Lowery*, 6th Dist. Lucas No. L-18-1170, 2020-Ohio-5549, ¶ 80, quoting *State v. Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440, ¶ 15. Thus, "'although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility.'" *Id.*, quoting *Carson* at ¶ 15.

{¶ 33} The jury in this case heard the testimony and the defense thoroughly cross-examined the minor victim. The victim consistently maintained that appellant motioned her back to his house, and that he locked the door when she went inside. G.A. has also consistently stated that he hugged her, grabbed her and kissed her, grabbed and squeezed her butt, and put her on his lap, facing him, and moved her around against him, all against

her will.  G.A. also testified that he grabbed her by the waist and tried to pull her shorts down, but she said no.  He pulled her in closer and tried to do it again, before stopping when he realized that she was on her period.

{¶ 34} It was clearly within the jury's province to weigh the evidence and credibility of G.A.  While there were some discrepancies about which charity G.A. was collecting money for on the day in question, those discrepancies do nothing to negate the evidence presented at trial of appellant's guilt.  Thus, we cannot say that the jury clearly lost its way in resolving the conflicts in the evidence such that the guilty verdict on any of the counts in this case would constitute a manifest miscarriage of justice.  *See Martin* at ¶ 8.

{¶ 35} Appellant also claims that the verdict was against the manifest weight of the evidence because G.A. was unable to identify him at trial.  This claim is clearly without merit, as the evidence in this case overwhelmingly demonstrates that appellant was the person whom G.A. identified as having committed the crimes.  As an initial matter, G.A. described the man who had assaulted her as being a tall, black male, with a skinnier build, and short hair, consistent with appellant's description.  In addition, G.A. took two photos of the house where she testified that the sexual assault had occurred, which Officer Coe determined was 1823 Barker Street.  Detective Nixon testified that appellant lived alone at that residence on August 17, 2019.  Furthermore, G.A. identified appellant's photo in a photo array just a few days after the incident, and she stated that

22.

she was confident that appellant was the man who had assaulted her. Although G.A. was initially unable to point to appellant in the courtroom at trial, more than a year and a half after the assault took place, she testified on redirect examination that it was appellant who had perpetrated the offenses against her. Further evidence of appellant's identity was revealed through the testimony of appellant's neighbor, Patricia Burkhart, who testified that she saw G.A. sitting on appellant's porch after they had left her house. Video footage from Henry Schonhardt's house showed appellant motioning down the street and G.A. stopping at the corner before heading back down the street to appellant's porch and going into appellant's house with him for approximately 10-11 minutes. Finally, appellant himself admitted to Jessica Sherrard that he had interacted with G.A. on his porch that day.

{¶ 36} Where, as here, a victim, particularly a young victim, identifies a perpetrator in a photo line-up with certainty but is unable to point to her assailant at trial more than a year later, the victim's identification testimony is not automatically discredited. *See State v. Newman*, 8th Dist. Cuyahoga No. 109182, 2020-Ohio-5087, ¶ 28 (rejecting a manifest weight challenge where the victim identified from a photo line-up and told police that it was 75 percent likely that he was her assailant, even though she was unable to identify him later at trial). Fact-finders "are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* (quotation omitted). Weighing all of the evidence and

23.

reasonable inferences, it is clear that the jury did not lose its way in resolving evidentiary conflicts, including identification testimony, so as to create a manifest miscarriage of justice that appellant's conviction must be reversed. *See Martin* at ¶ 8. Accordingly, appellant's second assignment of error is found not well-taken.

{¶ 37} In his third assignment of error, appellant contends that the trial court erred by permitting appellant's parole officer to testify at trial. According to appellant, this testimony had no relevance to the charges for which he was convicted and, further, was unfairly prejudicial because the jury could have inferred that he had previously been convicted of a sexually oriented offense involving children.

{¶ 38} Generally, evidence of other crimes is not admissible to prove "a defendant's character as to criminal propensity." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 96, citing Evid.R. 404(B). However, such evidence is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B); *see also* R.C. 2945.59. "In considering the admissibility of 404(B) evidence, a court must consider whether the evidence is relevant, whether it is offered for a legitimate purpose, and whether the probative value substantially outweighs the danger of unfair prejudice." *State v. Thomas*, 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, ¶ 26, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. This court reviews a decision to permit 404(B) evidence under an abuse of discretion standard.

24.

*Thomas* at ¶ 26. To find an abuse of discretion, the court "must find more than an error of law or judgment, and that the admission of other-acts evidence was 'unreasonable, arbitrary or unconscionable.'" *Id.*, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 350 N.E.2d 1140 (1983).

{¶ 39} Here, parole officer Debra Koler testified at trial about a stipulation between the parties that appellant had previously been convicted of a sexually oriented offense on or about April 19, 2012. Koler testified that she served as appellant's parole officer following that conviction, meeting with him approximately three times per month. She further testified that during those meetings, she advised appellant that he was not permitted to have any unsupervised contact with minors and that any supervised contact had to be approved. Finally, Koler testified that when she asked appellant for the pass code to his phone during the course of the investigation in this case, he refused to provide it.

{¶ 40} The first question we must ask in determining the admissibility of 404(B) evidence is whether this evidence was relevant to a fact of consequence. *See Williams* at ¶ 20. In the instant case, appellant was tried and convicted of importuning, which required proof that he had "previously been convicted of a sexually oriented offense or a child-victim oriented offense." R.C. 2907.07(F)(2). Because appellant's prior conviction was a material element of the importuning offense, the parole officer's testimony was clearly relevant.

25.

**{¶ 41}** The next question we must ask is whether the state's purpose in introducing 404(B) evidence was to show propensity. *See Williams* at ¶ 20. Here, the state did not offer the parole officer's testimony to show appellant's propensity. Instead, the state offered the testimony to establish that appellant had a prior conviction for a sexually oriented offense and, thus, under the circumstances of this case, was guilty of importuning.

**{¶ 42}** The third question we must consider is whether the probative value of the 404(B) evidence is outweighed by its prejudicial effect. *See Williams* at ¶ 20. Here, the parole officer's testimony was not unduly prejudicial. In light of the stipulation between the parties, the parole officer's testimony did not create a greater risk of prejudice than the jury knowing that appellant had previously been convicted of a sexually oriented offense. Thus, the risk of prejudice from Koler's testimony was not outweighed by its probative value in proving the kidnapping and importuning charges.

**{¶ 43}** In this case, we note that, in addition to the foregoing, the trial court gave a limiting instruction advising that the evidence of appellant's prior conviction "was received because a prior conviction is an element of the offense of Importuning" and that the jury "may not consider it to prove the character of the Defendant in order to show he acted in conformity or in accordance with that character." This court presumes that the jury followed those instructions. *State v. Gardner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) (a jury is presumed to follow instructions that are given to it by a trial judge).

26.

There is nothing in the record to suggest that Koler's testimony confused or misled the jury, particularly in light of the strict limitations that were placed on this evidence by the trial court. Appellant's third assignment of error is, therefore, found not well-taken.

{¶ 44} Appellant argues in his fourth assignment of error that he was denied a fair trial as a result of the cumulative effect of multiple errors committed by the trial court, including: (1) allowing appellant's parole officer to testify; (2) allowing the state to ask leading questions of the child victim; (3) allowing Juror No. 3 to remain on the jury; (4) allowing the victim's mother to remain in the courtroom while the victim testified; and (5) permitting testimony and video evidence related to appellant's arrest.

{¶ 45} The cumulative error doctrine provides that "'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. To determine whether the cumulative error doctrine applies, "there must first be a finding that multiple errors were committed at trial," and then "there must be a finding that there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Moore*, 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, ¶ 87.

27.

{¶ 46} Here, other than the standard for the cumulative error doctrine, appellant cites no legal authority to support his position with respect to any of the alleged errors. Because appellant has the burden of demonstrating error on appeal, this alone is sufficient to dispose of his assignment of error. *Moore* at ¶ 88. However, even considering the assigned error, appellant cannot demonstrate that multiple errors were committed or that there is a reasonable probability that the outcome of the trial would have been different but for the cumulative effect of the alleged errors.

{¶ 47} As previously explained, the trial court did not err by permitting limited testimony by appellant's parole officer, and any risk of prejudice was not outweighed by its probative value. In addition, the trial court did not err in allowing Juror No. 3 to remain on the jury, as she satisfactorily confirmed that she could be fair and impartial towards both parties.

{¶ 48} Appellant's contention that the trial court erred by allowing the state to ask leading questions is also without merit. Appellant points to no specific parts of the transcript to support his argument. However, the trial court did overrule defense counsel's objection to the state's use of leading questions on direct examination of the minor victim, G.A. Evid.R. 611(C) prohibits the use of leading questions on direct examination, "except as may be necessary to develop the witness' testimony." This provision "is broad and leaves the limits of the use of leading questions on direct examination within the sound discretion of the trial court." *State v. Jamison*, 6th Dist.

28.

Lucas No. L-12-1274, 2014-Ohio-3275, ¶ 27. While the record reveals that the trial court granted some leeway to the state to develop G.A.'s testimony, such leeway was not outside the discretion of the trial court. G.A. was only 12-years-old at the time of the trial, had noted developmental disabilities, and was testifying about her sexual abuse by appellant. Ohio courts "have continued to emphasize the latitude given the trial court * * *, especially in cases involving children who are alleged victims of sexual offenses." *State v. Rector*, 7th Dist. Carroll No. 01 AP 758, 2002-Ohio-7442, ¶ 30; *see also Jamison* at ¶ 30.

{¶ 49} Also without merit is appellant's contention that the trial court erred by allowing G.A.'s mother to remain in the courtroom during her daughter's testimony. Defense counsel objected to S.S.'s presence during G.A.'s testimony, on the grounds that there was a possibility that they would be able to "look at each other for answers." The trial court overruled the objection and ruled that S.S. would be allowed to sit in the back row. In addition, the trial court stated on the record that it would keep an eye on S.S. to ensure that there were no interactions between mother and child. Incidentally, S.S. was not in the courtroom when G.A. initially took the stand. It was not until nearly the end of G.A.'s testimony on direct that the trial court noted that S.S. had entered the courtroom and had sat down in the last row, with a mask covering her mouth. At the time S.S. entered the courtroom, S.S. had already testified, the defense had not subpoenaed her, and the state confirmed that it was not going to call her on rebuttal.

29.

{¶ 50} Under the circumstances of this case, allowing S.S. to be present in the courtroom during G.A.'s testimony was within the trial court's discretion. *See State v. Shifflet*, 4th Dist. Athens No. 13CA23, 2015-Ohio-4250, ¶ 62 (ruling that there was no harm where mother testified prior to victim and then accompanied her child to the room in which the child was testifying via closed circuit television). Because S.S. had finished testifying by the time G.A. took the stand, S.S.'s listening to G.A.'s testimony clearly had no way of influencing S.S.'s testimony. In addition, there is nothing in the record to suggest that S.S.'s presence in the courtroom had any influence whatsoever on G.A.'s testimony. To the contrary, immediately after G.A.'s testimony, the trial court made the following observation:

> I kept my eye on the mother the entire time. Most of the time she had her eyes down or she would look up at the ceiling. She looked at her daughter a couple of times. However, she wore her facial covering, mask, COVID-19 mask, covering, if you will, the entire time. It went from about the mid bridge of her nose down past her chin. It was on the entire time. So I could not hear, see, or detect in any way she communicated any answers to the witness.
>
> Unless there's any objection to the – what I just said or any other person saw, that's what I saw.

30.

Both the state and defense counsel articulated that they had no objection to the trial court's observations. Appellant has not identified any prejudicial error that occurred as a result of S.S.'s presence, and nothing in the record indicates that S.S.'s presence for part of G.A.'s testimony had any effect on the trial.

{¶ 51} Appellant's final claim -- that the trial court erred by permitting testimony and video evidence related to his arrest -- is likewise without merit. As an initial matter, the body camera video of appellant's arrest was never played at trial. Detective Nixon did testify briefly about appellant's arrest, noting that appellant did not immediately open the door for police and that he denied having had a child in his home on August 17, 2019. However, as this court has acknowledged, "[i]t is well-settled that 'lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself.'" *State v. Zimbeck*, 195 Ohio App.3d 729, 744, 2011-Ohio-2171, 961 N.E.2d 1141 (6th Dist.). In sum, the record demonstrates that appellant received a fair trial. None of the issues raised by appellant, either individually or cumulatively, warrant reversal. Therefore, appellant's fourth assignment of error is found not well-taken.

{¶ 52} Appellant argues in his fifth assignment of error that the trial court imposed a sentence that was contrary to law. To begin, appellant contends that the trial court erred by refusing to merge the two counts of gross sexual imposition, the gross sexual imposition and kidnapping counts, and the importuning and kidnapping counts.

31.

**{¶ 53}** The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment, provides that no person "shall be subject to the same offence to be twice put in jeopardy of life or limb." U.S. Const., Fifth Amend; *see also* Ohio Const., Art. I, Sec. 10. This clause protects against a number of abuses, including the protection against multiple punishments for the same offenses. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. To that end, the Ohio General Assembly enacted R.C. 2941.25, which establishes when multiple punishments may be imposed:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"The determination whether an offender has been found guilty of allied offenses of similar import 'is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct,' and 'an offense may be committed in a variety of ways.'" *State v.*

32.

*Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 18, quoting *Ruff* at ¶ 26, 30.

{¶ 54} In *Ruff*, the Ohio Supreme Court examined the analysis that courts must perform in determining whether offenses are allied offenses of similar import under R.C. 2941.25, identifying three questions that must be asked: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? *Ruff* at ¶ 31. With respect to the first question, the offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. If the answer to any of the questions is yes, the defendant may be sentenced for multiple offenses. *See id.* at ¶ 25, 31.

{¶ 55} We look first to appellant's claim that the trial court should have merged the two counts of gross sexual imposition. "'Intimate sexual contacts with a victim that constitute the offense of gross sexual imposition may be treated as separate offenses for the purposes of R.C. 2941.25(B) in at least two instances: (1) where the evidence demonstrates either the passage of time or intervening conduct by the defendant between each incident; and (d) where the evidence demonstrates the defendant's touching of two different areas of the victim's body occurred in an interrupted sequence.'" *State v. Cole*, 6th Dist. Erie No. E-18-061, 2019-Ohio-5425, ¶ 20, quoting *State v. DeGarmo,* 5th Dist. Muskingum No. CT2018-0061, 2019-Ohio-4050, ¶ 26. Accordingly, if appellant

33.

"committed acts separated by the passage of time or engaged in sexual contact involving more than one erogenous zone, even if in one brief episode, each instance may form the basis for separate counts and are not allied offenses." *Id.*

{¶ 56} The evidence at trial established that appellant committed multiple acts of gross sexual imposition against G.A. by forcing her to kiss him, by grabbing and squeezing her butt, by picking her up, putting her on his lap and grinding her against him, and by grabbing her hips to pull down her shorts. Because the evidence demonstrates that appellant's touching of more than one area of the victim's body occurred in an interrupted sequence, they were separate and distinct acts of gross sexual imposition that were dissimilar in import and significance. Thus, the trial court did not err in refusing to merge the two counts of gross sexual imposition.

{¶ 57} Next, we review appellants claim that the trial court should have merged the kidnapping count with the counts for gross sexual imposition. R.C. 2905.01(A)(4), in defining the offense of kidnapping, relevantly provides that "[n]o person * * * in the case of a victim under the age of thirteen * * * by any means, shall remove another from the place where the other is found or restrain the liberty of the other person" in order "[t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." Appellant contends that the only instance of kidnapping that could have occurred in this case "was when the victim was allegedly grabbed just prior to being assaulted." To the contrary, the kidnapping occurred even earlier, when

34.

appellant motioned or called G.A. back from the street corner to his house, invited her to come into his home, and locked the door once she was inside, all for the purpose of engaging in sexual activity against her will.

{¶ 58} R.C. 2907.05(A)(4), in defining the offense of gross sexual imposition, relevantly provides that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." Thus, as previously noted, the gross sexual imposition offenses occurred when appellant forced G.A. to kiss him, when he grabbed and squeezed her butt, when he picked her up, put her on his lap, and moved her around against him, and when he grabbed her hips to pull down her shorts. Thus, the kidnapping and gross sexual imposition charges are based on different conduct that was committed separately.

{¶ 59} In addition, the kidnapping and gross sexual imposition offenses are dissimilar in import and significance because they involved separate harms. *See Ruff* at ¶ 31. G.A. testified that she was afraid and started freaking out when appellant asked her to come into his home and he locked the door behind her. That harm is not identical to the harm caused by the acts of gross sexual imposition, which left G.A. in shock and resulted in marked changes in the minor, including two attempts to take her own life, nightmares, and trouble sleeping. Thus, the trial court properly declined to merge the kidnapping count with the counts for gross sexual imposition.

35.

{¶ 60} Finally, we consider appellant's claim that the trial court erred in failing to merge the counts of importuning and kidnapping. The state argues that merger is not appropriate, because the two offenses were committed separately.

{¶ 61} Under the importuning statute, "[n]o person shall solicit a person who is less than thirteen years of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person." R.C. 2907.07(A). R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both," and R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." The Ohio Jury Instructions define the solicitation element as "to seek, to ask, to influence, to invite, to tempt, to lead on, or to bring pressure to bear." 2 Ohio Jury Instructions, Section 507.07(2) (2006). "Thus, even in the absence of evidence that the defendant 'asked' the minor to engage in sexual activity, a defendant may still be found guilty of importuning under R.C. 2907.07 if there is evidence that the defendant sought, influenced, invited, tempted, led, or pressured the victim to engage in sexual activity." *State v. Kent*, 8th Dist. Cuyahoga No. 98863, 2013-Ohio-2461, ¶ 14.

{¶ 62} As indicated above, under the kidnapping statute, "[n]o person * * * in the case of a victim under the age of thirteen * * * by any means, shall remove another from the place where the other is found or restrain the liberty of the other person" in order "[t]o

36.

engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." R.C. 2905.01(A)(4). As previously stated, appellant committed the kidnapping when he motioned or called G.A. back from the street corner to his house, invited her to come into his home and locked the door, once she was inside, for the purpose of engaging in sexual activity against her will. Thus, the kidnapping was already completed when appellant committed the importuning offense, that is, when he asked G.A. to give him a hug, asked to see the scars on her chest, and asked her to take off her shorts – thereby seeking, asking, influencing, inviting, tempting, or pressuring G.A. to engage in sexual activity.

{¶ 63} Furthermore, the importuning and kidnapping offenses involved separate harms, and, therefore, are not allied offenses of similar import. *See Ruff* at ¶ 31. G.A. testified that when appellant locked her in his house, she was scared and she started freaking out. This resulted in harm, even if no soliciting to engage in sexual activity had occurred. Accordingly, the trial court did not err in failing to merge the charges for importuning and kidnapping.

{¶ 64} Appellant next argues that "the Reagan Tokes law was not properly applied, as the sentencing entry does not reflect a minimum prison term." R.C. 2929.144(C) requires that the trial court impose the "maximum term at sentencing as part of the sentence it imposes" under R.C. 2929.14, "and shall state the minimum it imposes under division (A)(1)(a) or (2)(a) of that section, and this maximum term, in the

sentencing entry." Contrary to appellant's claim, however, the trial court's sentencing entry does, in fact, state the minimum prison terms for each of the charges of which appellant was convicted – ten years for kidnapping, eight years for importuning, and 60 months (or five years) for each of the two counts of gross sexual imposition. The trial court further notified appellant of these mandatory sentences at the sentencing hearing, and explained that he had an aggregate minimum sentence of 28 years and a maximum aggregate sentence of 33 years. The trial court also properly informed appellant of the other required notifications set forth in R.C. 2929.19(B)(2)(c)(i)-(v). Appellant's argument that "the Reagan Tokes law was not properly applied" is, therefore, dismissed as meritless.

{¶ 65} Lastly, appellant contends that the RVO specification to which he was sentenced "was invalid because from the record, it is not apparent that the prosecuting attorney ever advised the Appellant of its intent to use a certified copy of a prior conviction as proof of that conviction pursuant to R.C. 2941.149(C), nor is it apparent that the certified copy of the prior conviction was introduced into evidence." In the instant case, a superseding indictment was issued on November 14, 2019, which added the RVO specification to the kidnapping charge. The superseding indictment clearly states that the specification was based on appellant's prior conviction for "Attempted Rape, to wit: on or about April 3, 2012, in the Common Pleas Court, Erie County, Ohio, in violation of ORC Section 2907.02 and 2923.02(A), in 2011-CR-530." The indictment

38.

complies with R.C. 2941.149, which requires that the RVO specification must be contained in the indictment. Further, there is no indication in the record that the prosecuting attorney did not give appellant notice of prosecuting attorney's intention to use a certified copy of that judgment of conviction as proof of the prior conviction. Appellant was sufficiently apprised of the basis for the RVO specification such that he could prepare his defense. Furthermore, contrary to appellant's claim, the record demonstrates that on May 10, 2021, at a hearing addressing the RVO specification, the state did admit a certified copy of appellant's conviction of the attempted rape. Appellant's argument that the RVO specification was invalid is, therefore, dismissed. Appellant's fifth assignment of error is found not well-taken.

{¶ 66} For all of the foregoing reasons, the judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.