[Cite as *State v. Pinckney*, 2023-Ohio-4630.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 30334 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSEPH PINCKNEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 21 02 0507(B) |

DECISION AND JOURNAL ENTRY

Dated: December 20, 2023

HENSAL, Presiding Judge.

{¶1} Joseph Pinckney appeals his convictions for aggravated murder, aggravated burglary, and felonious assault from the Summit County Court of Common Pleas. For the following reasons, this Court affirms.

I.

{¶2} According to D.J., on the evening of December 19, 2020, he and his male friend L.C. went to a house in Akron where his female friend A.J. was living. Also at the house were D.H., a woman who was renting the house, and T.V., who was D.H.'s male cousin. At one point during the evening, there was no more alcohol, so D.J. left to buy more. He said that, when he returned, D.H. and T.V. were chatting inside a car that was in the driveway. They later came back inside the house.

{¶3} Around 11:30 p.m., there was a knock at the front door. According to D.J., D.H. told him not to answer the door because it was "Red," who D.J. believed referred to Mr. Pinckney.

Shortly thereafter, D.J. heard knocking and banging at the back kitchen door, followed by gunshots, six of which hit T.V, killing him. D.J. testified that he looked toward the shooter but only saw the gun before diving onto the floor. Despite suffering a gunshot to his shoulder, D.J. made his way to the front door. Once outside, he got in his car and drove himself to the hospital, calling 911 along the way.

{¶4}    According to two neighbors, they heard a commotion at the house, followed by gunshots. They then saw Mr. Pinckney leave the house, get in a car that was in the street, and leave. They were familiar with Mr. Pinckney because he used to live on the street and would visit D.H. at the house. One of the neighbors also testified that she saw D.H. and A.J. remove things from T.V.'s car after the shooting. The women carried the items down the street then returned to the house empty-handed. It was not until D.H. returned to the house that she began shouting about her cousin being shot.

{¶5}    A Grand Jury indicted Mr. Pinckney for Aggravated Murder, Murder, Aggravated Burglary, and Felonious Assault, including firearm specifications for each offense. A jury found him guilty of one count of aggravated murder, one count of aggravated burglary, and two counts of felonious assault as well as the firearm specifications for each offense. The trial court sentenced him to life imprisonment without parole eligibility. Mr. Pinckney has appealed, assigning six errors.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO STRIKE AN AFRICAN-AMERICAN JUROR FROM THE VENIRE WHERE THE STATE FAILED TO PROVIDE A RACE-NEUTRAL RATIONALE FOR THE STRIKE.

{¶6} In his first assignment of error, Mr. Pinckney argues that the trial court incorrectly allowed the State to use a peremptory challenge on juror number 14, an African-American juror. This court adjudicates such claims in three steps. *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001). "First, the opponent of [a] peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106, citing *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986). "Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination." *Id*. "The judge must 'assess the plausibility' of the prosecutor's reason for striking the juror 'in light of all evidence with a bearing on it.'" *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 63, *overruled on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, ¶ 35, quoting *Miller–El v. Dretke*, 545 U.S. 231, 252 (2005). A trial court's finding of no discriminatory intent will not be reversed on appeal unless the finding is clearly erroneous. *State v. Hernandez*, 63 Ohio St.3d 577, 583 (1992), citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991).

{¶7} During voir dire, the prosecutor asked the jury pool whether anyone would need forensic evidence to find a person guilty, even if there were ten eyewitnesses who said the person had committed a crime. Juror number 6 stated that forensic evidence was needed and that without such evidence, it would be hard to determine whether someone was guilty. Juror number 14 said that you need more than eyewitness testimony to convict someone. Juror number 12 said that, although eyewitness testimony is important, forensic evidence is helpful as well.

{¶8} The prosecutor followed up with juror number 12, asking whether he could convict someone if he listened to all the testimony and it rose to the level of proof beyond a reasonable

doubt. The juror said he could, even if there was no forensic evidence. The prosecutor next asked juror number 14 the same question, but the juror replied that he thought it would be too early to go to trial if there was no forensic evidence. The juror also expressed that, in his opinion, if there is no forensic evidence, there should never be a trial. Juror number 6 stated that, if every single witness said the exact same thing, she could possibly find someone guilty beyond a reasonable doubt.

{¶9} Mr. Pinckney's counsel followed up on the issue as well. Discussing the difference between the quantity of the evidence and the quality of the evidence, he asked juror number 14 whether he might listen to all the evidence in the case and be convinced that the eyewitness testimony was enough. The juror agreed that he could vote guilty based on that type of evidence alone if convinced beyond a reasonable doubt that it was enough evidence. Juror number 6 also agreed that she could follow the law and convict someone if the evidence in the case convinced her beyond a reasonable doubt. Juror number 12 also stated that he could find someone guilty if the State met its burden. Mr. Pinckney's counsel also asked the entire juror pool whether there was anyone who could not vote guilty unless there was a particular type of evidence and received no response.

{¶10} The prosecutor attempted to have juror number 6 excused for cause because of her answer about needing forensic evidence. The court denied his request because it found that the juror had been rehabilitated on the issue. The prosecutor, therefore, used his first peremptory challenge on juror number 6. With his third peremptory challenge, the prosecutor removed juror number 14. Mr. Pinckney objected because of the juror's race. In response, the prosecutor pointed to the juror's statements about how he would vote if there was no forensic evidence and because of the large amount of time it took to rehabilitate him. Mr. Pinckney argued that the prosecutor

had mischaracterized the juror's responses and had asked the juror questions that presented a binary choice that did not allow the juror to make a fair response. Mr. Pinckney alleged that the juror had never said that he required forensic evidence and asked that the juror be individually voir dired. The prosecutor replied by pointing out that the juror had specifically said that it would be too early to go to trial if there was no forensic evidence. The trial court overruled Mr. Pinckney's objection and allowed the prosecutor to excuse the juror with his third peremptory challenge. With his fourth peremptory challenge, the prosecutor removed juror number 12.

{¶11} The State used three of its four peremptory challenges to remove the prospective jurors who were initially hesitant about convicting someone if there was no forensic evidence. Upon review of the record, we cannot say that the trial court clearly erred when it determined that Mr. Pinckney failed to establish purposeful racial discrimination. Mr. Pinckney's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BOLSTERING AN EYEWITNESSES' CREDIBILITY RESULTING IN PREJUDICE AGAINST THE DEFENDANT.

{¶12} In his second assignment of error, Mr. Pinckney argues that the trial court incorrectly vouched for the credibility of a witness, even thanking the witness for telling the truth that day. We decline to address the merits of Mr. Pinckney's argument "because he did not object to the trial court's comments, and he has failed to develop a plain error argument on appeal." *State v. Anderson*, 9th Dist. Wayne No. 14AP0054, 2016-Ohio-7814, ¶ 12. Mr. Pinckney's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EYEWITNESS['S] IDENTIFICATION BASED ON AN UNNECESSARILY SUGGESTIVE PHOTO ARRAY.

{¶13} In his third assignment of error, Mr. Pinckney argues that the trial court incorrectly denied his motion to suppress the testimony of two of the witnesses because a police officer improperly suggested his identity to them. A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997). This Court, therefore, grants deference to the trial court's findings of fact but conducts a de novo review of whether the trial court applied the appropriate legal standard to those facts. *State v. Booth*, 151 Ohio App.3d 635, 2003-Ohio-829, ¶ 12 (9th Dist.).

{¶14} Mr. Pinckney notes that identification evidence may not be introduced if the technique used to gather that evidence "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). He argues that a court must look at the totality of the circumstances, including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

{¶15} According to a police detective, he responded to the scene on the night of the shooting and talked to witnesses. One of the witnesses was a neighbor who had called 911. The detective spoke to her about two and a half hours after the shooting. The neighbor told him that she had made face-to-face contact with a man as he was running from the scene. Specifically, she told the detective that she was looking down on the street from a window on the second story of her house and the man looked directly up at her. She gave a description of the man, including his approximate height and weight, his skin color, what he was wearing, and that he was carrying a gun. Although she did not know the man's name, she was familiar with him because of a domestic disturbance at D.H.'s house two weeks earlier and because he had been at the house again the day before the shooting. When the detective learned that Mr. Pinckney was a person of interest, he showed the neighbor a picture of Mr. Pinckney that had been sent to his cellphone. The neighbor recognized the person and said that it looked like the person she had seen leaving the scene. She told the detective that she was 90% confident in her identification.

{¶16} The other witness was D.J. According to the detective, he spoke to D.J. nine days after the shooting because he wanted to show D.J. a picture of Mr. Pinckney and ask if D.J. knew who it was. D.J. told the detective that he knew Mr. Pinckney from 17 years earlier when they attended the same school and that he knew Mr. Pinckney by the name Red. He had last seen Mr. Pinckney two months earlier at a birthday party, which was the first time he had seen him since middle school. The detective testified that he showed D.J. a photograph of Mr. Pinckney only to determine whether it was the person D.J. knew as Red. He did not think it was necessary to show a photo array to either the neighbor or D.J. because they both had prior knowledge of Mr. Pinckney.

{¶17} Upon review of the record, we conclude that neither photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. "A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed." *State v. Huff*, 145 Ohio App.3d 555, 564 (1st Dist.2001). Here, the neighbor knew who she had seen leaving the scene from his prior visits to the house, she just did not know his name. The photograph was used to confirm that Mr. Pinckney was the person she had previously seen at the house and after the shooting. *See id*. (explaining that photograph "was not used to identify an unknown attacker but was used merely to confirm [the attacker's] true identity."). Regarding D.J., the photograph was only used to confirm that Mr. Pinckney was the person who D.J. knew as Red, not to identify him as the shooter. *See In re Tims*, 2d Dist. Montgomery No. 20047, 2004-Ohio-674, ¶ 21; *State v. Alford*, 9th Dist. Summit No. 29411, 2020-Ohio-1099, ¶ 14. The trial court, therefore, did not err when it denied Mr. Pinckney's motion to suppress. Mr. Pinckney's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENDANT'S CRIM.R. 29 MOTIONS FOR ACQUITTAL AND ENTERING JUDGMENT ON THE VERDICT UNSUPPORTED BY SUFFICIENT EVIDENCE.

{¶18} In his fourth assignment of error, Mr. Pinckney argues that the trial court should have granted his motions for judgment of acquittal because there was insufficient evidence to support his convictions. Under Criminal Rule 29(A), a defendant is entitled to a judgment of acquittal on a charge against him "if the evidence is insufficient to sustain a conviction * * *." Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if

believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶19} Mr. Pinckney argues that the State failed to prove his identity or that he committed the actus reus of the crimes of aggravated murder and felonious assault. He argues that there was no forensic evidence tying him to the crimes, merely the identifications of three witnesses, each of which was flawed. He also argues that the only witness who was inside the house at the time of the shootings admitted that he did not see the shooter because his attention was focused on the gun.

{¶20} The evidence of Mr. Pinckney's identity as the shooter is circumstantial, but circumstantial evidence has the same probative value as direct evidence and may even be "more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991); *State v. Santana*, 9th Dist. Lorain No. 22CA011895, 2023-Ohio-3405, ¶ 14. D.J. testified that he was told that Mr. Pinckney, who he knew as Red, was at the front door and to not answer the door. Shortly thereafter there was loud noise at the back door followed by gunshots. Around the same time, two neighbors heard a commotion and gunshots at the house, then saw Mr. Pinckney walk away from the house holding a gun. Viewed in a light most favorable to the prosecution, we conclude that there was sufficient evidence that Mr. Pinckney was the person who shot T.V. and D.J. Mr. Pinckney's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED BY ENTERING JUDGMENT ON THE VERDICT
AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} In his fifth assignment of error, Mr. Pinckney argues that his convictions are against the manifest weight of the evidence. When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 9th Dist. Summit No. 29290, 2019-Ohio-3970, ¶ 26.

{¶22} Mr. Pinckney argues that, even if the circumstantial evidence was sufficient to convict him, it did not satisfy the State's burden of persuasion. He argues that the eyewitnesses recounted contradictory stories and details. For instance, comparing what D.J. told the 911 operator, medical personnel at the hospital, the detectives who interviewed him after the shooting, and at trial, he was inconsistent about whether he saw the shooter. One of the neighbors reported to a 911 operator that she saw the shooting as it was happening, she was inconsistent about whether the shooter was wearing a mask, and she was inconsistent about whether the person was holding a gun. The other neighbor was inconsistent about whether he saw any vehicles. The two neighbors also disagreed about whether the shooter left the scene in a white, dark blue, or black vehicle.

{¶23} Mr. Pinckney also notes that DNA testing of the evidence eliminated him as a contributor to any of the samples. Law enforcement also failed to secure the scene in a timely manner, allowing unidentified people to wander through the crime scene, and it failed to retrieve surveillance footage from D.H.'s house. He further argues that the internet searches he conducted

after the shooting were the type of searches anyone who knew they were a murder suspect would do as they tried to determine the best way to address their situation.

{¶24} Although the neighbors may have been inconsistent about peripheral details such as the color of the vehicle they saw Mr. Pinckney use to leave the scene, they both identified Mr. Pinckney as the person they saw leave first after the shooting. Both neighbors were familiar with Mr. Pinckney from prior encounters. One of the neighbors said he even used to cut Mr. Pinckney's lawn when Mr. Pinckney lived on the street. The neighbor who told the 911 operator that she had seen the shooting first-hand acknowledged that she misled the operator but explained that she only did so because she was trying to elicit a faster response from emergency personnel. She also claimed that she was not initially truthful about whether she had seen the face of the second person who left the property because she was scared and did not want to be involved.

{¶25} A detective testified that he attempted to recover the house's surveillance footage but D.H. was uncooperative, claiming she could not remember the password that was needed to view the footage online. He did not seize D.H.'s phone because she was considered a victim at the time, not a suspect. The house also burned down the next day during a vigil for D.J., destroying the security system. The detective acknowledged that, because of other incidents occurring in the city that evening, it took some time for him to arrive and secure the scene.

{¶26} We recognize that there are inconsistencies in the stories of the witnesses when comparing what they testified to in court with what they had said earlier. There are also inconsistencies among the different witnesses. The jury, however, was "free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35, citing *State v. Jackson*, 86 Ohio App.3d 29, 33 (4th Dist. 1993). It is within the province of the trier of fact to reconcile inconsistencies in testimony because the finder of fact

is present to "view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). The witnesses had explanations for why their stories changed over time, which the jury could have accepted as truthful. According to the neighbors, they initially did not want to be involved in the situation but later changed their minds. According to D.J., when he first spoke to detectives he was on medication for his pain and injuries. We note that "[a] conviction is not against the manifest weight because the [finder of fact] chose to credit the State's version of events." (Alteration in original.) *State v. Shank*, 9th Dist. Medina No. 14CA0090-M, 2016-Ohio-7819, ¶ 29, quoting *State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 18.

{¶27} Upon review of the record, we cannot say that the jury clearly lost its way or that this is the exceptional case in which the evidence weighs heavily against the convictions. *See Croghan*, 2019-Ohio-3970 at ¶ 26. We conclude that Mr. Pinckney's convictions are not against the manifest weight of the evidence. Mr. Pinckney's fifth assignment of error is overruled.

ASSIGNMENT OF ERROR VI

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO CLAIM IN CLOSING THAT THE DEFENSE BORE A BURDEN TO DISPROVE ALLEGATIONS, WHERE THE DEFENDANT CARRIES NO BURDEN OF PROOF.

{¶28} In his sixth assignment of error, Mr. Pinckney argues that the State committed prosecutorial misconduct during closing argument because the prosecutor improperly shifted the burden of proof to him to prove his location on the night of the shooting. He argues that the statement was prejudicial because the crux of the case was the identity of the shooter. He also argues that the trial court failed to cure the error with a special instruction about the improper statement. Mr. Pinckney, therefore, argues that he was deprived of the right to a fair trial.

{¶29} When prosecutorial misconduct is alleged to have occurred in the context of closing argument, this Court must consider whether the remarks at issue were improper and, if they were, whether the defendant's substantial rights were prejudicially affected. *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, ¶ 115. The test for determining whether prosecutorial misconduct has occurred is "whether the conduct complained of deprived the defendant of a fair trial." *State v. Fears*, 86 Ohio St.3d 329, 332 (1999). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). When determining whether a defendant was deprived of a fair trial, this Court must consider "the effect the misconduct had on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). If the alleged misconduct takes the form of remarks made during closing argument, that argument must therefore be viewed in its entirety to determine whether prejudice resulted. *Id*.

{¶30} During his closing argument, Mr. Pinckney argued that it was implausible that D.H. could have known it was him at the front door of the house because of where she was sitting in the house and the number, type, and layout of doors at the front of the house. He also argued that, if D.H. and he were in league to kill and rob T.V., it would not make any sense for her to place him at the scene of the crime. Mr. Pinckney also noted that he and D.H. had been involved in a domestic disturbance two days earlier and that he knew the house had a surveillance system from that incident. Mr. Pinckney pointed out the unidentified people walking through the house after officers arrived and D.H.'s uncooperativeness with providing the surveillance footage, even though she had been able to provide it from the domestic disturbance. Mr. Pinckney also pointed out the inconsistencies and embellishments in the neighbors' accounts and that there was no DNA evidence that he had touched the shell casings. He noted that the police failed to interview L.C.

before L.C's death 45 days after the shooting. Regarding his cell phone records, Mr. Pinckney argued that it was normal to look up attorneys, what it means to be a suspect, what it means to be charged with aggravated murder, what would happen if he ran, about the process of turning himself in, and whether video can be recovered from a burnt DVR system.

{¶31} During the State's rebuttal, the prosecutor reviewed what happened after the person named Red came to the front door. The prosecutor stated that the defense had not and could not dispute that Mr. Pinckney was Red, noting that, when D.J. was coordinating meeting up with A.J at the home of one of A.J.'s cousins, D.J. sent her a text message asking if the cousin was the one who was in a relationship with Red. The prosecutor then stated: "What's really important, I think, to remember is the evidence that the defense did not provide to you." Mr. Pinckney objected, but the trial court overruled his objection. The prosecutor, therefore, continued: "Do you know what the defense did not provide you? Mr. Pinckney's cell phone from the night of." Mr. Pinckney objected again, arguing that the prosecutor was shifting the burden of proof. The trial court "caution[ed]" the prosecutor, who moved on to discussing the cell phone that Mr. Pinckney had at the time of his arrest, noting that it had been activated less than 12 hours after the shooting.

{¶32} "It is long-standing precedent that the state may comment upon a defendant's failure to offer evidence in support of [his] case." *State v. Collins*, 89 Ohio St.3d 524, 528 (2000). "Such comments do not imply that the burden of proof has shifted to the defense[.]" *Id.* The prosecutor's statements were in response to Mr. Pinckney's argument that his cell phone activity was consistent with that of an innocent person. Even if the prosecutor's statements were improper, however, the trial court stopped the line of remarks after Mr. Pinckney objected to them. In the context of the entire trial, including jury instructions that correctly explained the burden of proof,

we cannot say that the prosecutor's statements deprived Mr. Pinckney of a fair trial. Mr. Pinckney's sixth assignment of error is overruled.

## III.

**{¶33}** Mr. Pinckney's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

SENECA KONTURAS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.